IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO UNITED INDUSTRIES, LTD., an Illinois corporation, GEORGE LOERA, and NICK MASSARELLA, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO.: 05-CV-5011 |
| CITY OF CHICAGO, an Illinois municipal corporation, MARY DEMPSEY, and LOUIS LANGONE, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a Motion to Reconsider Pursuant to Rule 59(e) (DE 208), filed by Plaintiffs George Loera and Nick Massarella on December 17, 2007. On December 3, 2007, the judge previously assigned to this case granted summary judgment against individual Plaintiffs George Loera and Nick Massarella on their claims for procedural due process (Count I), substantive due process (Count II), and retaliation (Count IV). Plaintiffs Loera and Massarella ask this Court to revisit the prior ruling, specifically, Judge Kennelly's decision to grant summary judgment for Defendants on Loera and Massarella's procedural due process claims.[1] For the reasons stated below, the Court denies the motion to reconsider.

---

[1] Plaintiffs assert on page three of their Memorandum that their reconsideration motion is also directed at their substantive due process claim; however, after this reference, they do not mention, much less address, Judge Kennelly's conclusion that "it is well settled in this Circuit that a deprivation of occupational liberty cannot ground a substantive due process claim." 12/3/07 Order at 15. Because Plaintiffs have not made any effort to challenge Judge Kennelly's ruling on Plaintiffs' substantive due process claims, the Court limits its review to Plaintiffs' procedural due process claims.

**I.     Background**[2]

Plaintiffs' claims arise from the City of Chicago's decision in August 2005 to bar Chicago United Industries ("CUI"), George Loera, and Nick Massarella from doing business with the City. Prior to the debarment, CUI had been awarded contracts to provide City departments with stop signs, traffic control signals, fire extinguisher boxes, emergency telecommunications equipment, and other items. As a result of the debarment, the City allegedly terminated or stopped performing on over forty contracts that CUI had with the City, whose value, CUI alleges, was around $12 million. Plaintiffs contend that the debarment also had the effect of preventing them from doing business with other firms that had City contracts. Plaintiffs allege that the debarment and termination violated Loera and Massarella's rights to due process – because Loera and Massarella never were notified that the City was considering debarring them personally – and that the procedure the City used was a sham. Plaintiffs also allege that during the debarment proceedings, the City and its representatives made false and defamatory statements about CUI, Loera, and Massarella to the press, City departments, and companies with which CUI does business. Finally, Plaintiffs allege that Defendants later retaliated against them for filing suit to challenge the debarment.

Plaintiffs filed this suit on August 30, 2005, six days after the debarment. They obtained a temporary restraining order from the judge to whom the case was then assigned. The Seventh Circuit reversed the order after concluding that it amounted to an appealable preliminary injunction because of its duration and finding that the claim for injunctive relief had been rendered moot by the City's reinstatement of the cancelled contracts, rescission of the debarment order, and

---

[2] The majority of these facts are taken from Judge Kennelly's Order of December 3, 2007, and are viewed in the light most favorable to Plaintiffs.

amendment of debarment rules to provide for additional procedures before a debarment could occur. See *Chicago United Inds., Ltd. v. City of Chicago,* 445 F.3d 940 (7th Cir. 2006). The Seventh Circuit vacated the injunction but remanded the case for consideration of any claims for damages.

After remand, Plaintiffs filed three amended complaints. The third (and currently operative) amended complaint, filed in August 2007, alleges that CUI has been doing business with the City, the City's primary contractors, and other governmental agencies in northern Illinois for approximately twenty years. Plaintiffs allege that on an unspecified date, CUI was awarded a contract by the City, worth $1,530,000, to provide more than 300,000 blank signs ("blanks") to the City's Department of Transportation (DOT). Pursuant to that contract, DOT placed an order for 12,000 blanks, which CUI delivered in January 2005. Shortly thereafter, Louis Langone, DOT's director of administration, claimed that CUI had shorted the City by 222 blanks, saying he had counted the blanks by hand. Massarella allegedly visited the DOT's sign shop and saw that the blanks were still shrink-wrapped. He believed that Langone could not possibly have counted the blanks and had made a false allegation against CUI as an excuse to avoid or delay payment. CUI then provided the City with documentation that the appropriate number of blanks had been delivered and requested payment. According to Plaintiffs, CUI was told to deal only with the City's Department of Procurement Services ("DPS") and its attorneys. CUI was eventually paid for all but 222 blanks.

On March 31, 2005, the City issued a notice of intent to debar CUI.[3] In that notice, the City asserted that CUI had submitted a false shipping ticket to DOT regarding the delivery of the blanks

---

[3] Plaintiffs also allege that in March 2005 the City issued a notice of intent to decertify CUI as a minority business enterprise on the ground that it was ineligible for such a certification. No formal action has been taken on the de-certification.

and tried to collect $2,400 that it knew was not owed. The notice did not state that the City was considering debarring Loera or Massarella personally. Plaintiffs also allege that at the time the City issued the notice, it issued press releases falsely claiming that CUI was dishonest and had committed a fraud on the City. On April 29, 2005, CUI submitted a written response to the notice of intent to debar, including a sworn affidavit from the manufacturer of the blanks stating that any shortage was the result of its own error and that CUI and its representatives were unaware of the error.

According to Plaintiffs, during the ensuing four months, DOT and the City did not respond to Plaintiffs' requests for meetings or a hearing regarding the allegations in the notice. Plaintiffs also allege that during this time, DPS directed other City departments not to honor their contracts with CUI or do business with CUI and advised other contractors to do the same, even though this allegedly violated the City's debarment procedures. As a result, Plaintiffs allege that manufacturers and suppliers under contract with CUI terminated their relationships with the company.[4] Plaintiffs say they repeatedly protested these actions by the City and requested a hearing and meetings with DPS and Mary Dempsey (the City's interim chief procurement officer), but were ignored.

On August 24, 2005, the City debarred CUI, corporately, and Massarella and Loera, individually, from conducting any business with the City of Chicago for a period of three years. Plaintiffs contend that the debarment occurred without any opportunity to rebut the evidence against them and without findings by an impartial finder of fact. As a result of the debarment, Plaintiffs allege that CUI's business with the City was terminated, and all payments due to CUI were placed on hold.

---

[4] Plaintiffs also allege that the City, "contrary to its own long-standing business practices," allowed at least nine contracts it had with CUI to lapse between February and July of 2005.

4

CUI, Loera, and Massarella then filed this lawsuit and moved for a temporary restraining order. As noted earlier, the judge to whom the case was then assigned issued the TRO, enjoining the City from (i) enforcing the debarment of Plaintiffs, (ii) canceling any existing contracts with CUI, and (iii) conducting any further proceedings on the decertification. The TRO was later extended and modified to prevent the City from doing an end run around CUI's existing contracts by procuring from other entities the materials covered by those contracts.

Plaintiffs allege that after the filing of this suit and the entry of the TRO, the City retaliated against Plaintiffs by threatening to institute new debarment proceedings, failing to inform City departments and vendors that CUI was again eligible to do business with the City, canceling existing contracts, refusing to award other contracts to CUI even though it was the low bidder, offering other City contractors unspecified "incentives" not to do business with CUI, and taking various other actions. As a result, Plaintiffs contend that certain vendors declined to do business with Plaintiffs. CUI also alleges that the City further retaliated by refusing to act on CUI's request for re-certification as a minority business enterprise and charging Massarella with violating a City ordinance imposing civil penalties for making false claims (a charge that the City later dropped).

Defendants moved for summary judgment against Plaintiffs Loera and Massarella on their claims for procedural due process (Count I), substantive due process (Count II), and retaliation (Count IV) and also asserted that Count V (for "injunctive relief") did not establish a distinct claim and was "purely remedial." Judge Kennelly granted summary judgment for Defendants on all issues raised by Defendants' motion. In the instant motion, Plaintiffs challenge only Judge Kennelly's decision to grant summary judgment for Defendants on Loera and Massarella's procedural due process claims.

5

**II. Analysis**

**A. Standard for a Motion to Reconsider**

A court may alter or amend a judgment under Federal Rule of Procedure 59(e) when the movant "clearly establish[es]" that "there is newly discovered evidence or there has been a manifest error of law or fact." *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006). While Rule 59(e) allows a movant to bring to a court's attention a manifest error of law, it "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).

**B. Plaintiffs' Procedural Due Process Claims**

**1. Judge Kennelly's Ruling on the Legal Standard for Plaintiffs' Procedural Due Process Claims**

A procedural due process claim requires a two-fold analysis. "First, a court must determine whether the plaintiff was deprived of a property or liberty interest." *McMahon v. Kindlarski*, 512 F.3d 983, 988 (7th Cir. 2008). If the plaintiff has a property or liberty interest, then a court must determine what process is due. *Id.* In this case, Plaintiffs Loera and Massarella contend that Defendants deprived them of a liberty interest in their occupation when the City barred CUI, Loera, and Massarella from doing business with the City.

The concept of liberty protected by the Due Process Clause includes one's occupational liberty, or "the liberty to follow a trade, profession, or other calling." *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992). In this case, both sides agree that Plaintiffs have identified a liberty interest – occupational liberty – that is protected by the Fourteenth Amendment's

due process clause; however, Defendants contend, and Judge Kennelly agreed, that Plaintiffs have not shown the requisite deprivation of that interest in the form of lost employment opportunities.

The genesis of the Seventh Circuit's stance on occupational liberty can be found in *Board of Regents v. Roth*, 408 U.S. 564 (1972). In *Roth*, the Supreme Court held that a state may infringe a plaintiff's liberty interest when, in failing to rehire an employee, it makes a "charge against him that might seriously damage his standing and associations in his community" that places his "good name, reputation, honor, or integrity * * * at stake" or when, in failing to rehire, it imposes on the plaintiff "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Id.* at 573. In subsequent decisions, the Supreme Court emphasized that, to implicate a liberty interest, such charges of defamation must be coupled with the alteration of a legal status, such as the loss of an employment position. See *Paul v. Davis*, 424 U.S. 693, 708-10 (1976); see also *Ratliff v. City of Milwaukee*, 795 F.2d 612, 625 (7th Cir. 1986).

As the Seventh Circuit has interpreted *Roth,* a liberty interest may be threatened in two types of situations when the government removes someone from an employment position: "(1) the individual's good name, reputation, honor or integrity are at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, Communism or subversive acts; or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities." *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985). When a plaintiff claims that the government has infringed upon his liberty to pursue the occupation of his choice, the plaintiff must show that "(1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001). The Seventh Circuit recently summed

7

up a plaintiff's burden: "[t]o find a violation of a constitutionally protected liberty interest in a situation where the state actor is the employer, a plaintiff-employee would have to show that the defendants called into question his 'good name, reputation, honor or integrity' in a way that made it 'virtually impossible for the employee to find new employment in his chosen field.'" *McMahon*, 512 F.3d at 988 (quoting *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001)). This requirement appears to flow from earlier concerns expressed by the Seventh Circuit:

> Some cases continue to suggest that defamation coupled with firing is a deprivation of liberty, see, *e.g.*, *Perry v. FBI,* 781 F.2d 1294, 1300 (7th Cir. 1986) (en banc); but since neither reputation nor government employment at will is an aspect of the liberty (or property) protected by the Fifth and Fourteenth Amendments, these cases are better explained as holding that to fire a worker to the accompaniment of public charges that make it unlikely that anyone will hire him for a comparable job infringes his liberty of occupation.

*Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987) (citing *Goulding v. Feinglass,* 811 F.2d 1099, 1102-03 (7th Cir. 1987)). The Seventh Circuit further has stated that a plaintiff must show that "it is unlikely that *anyone* will hire him for a comparable job in the future." *Townsend*, 256 F.3d at 670 n.9 (emphasis added); see also *RJB Props. v. Bd. of Educ. of the City of Chicago*, 468 F.3d 1005, 1011 (7th Cir. 2006).

Plaintiffs argue that, under *Roth*, they may prove their procedural due process claims by showing that either (1) their good name, reputation, honor, or integrity were at stake because of the government's adverse actions, or (2) the government imposed a stigma that foreclosed their freedom to take advantage of other employment opportunities. Plaintiffs contend that they need not show that they were "virtually unemployable" to demonstrate an infringement of their occupational liberty interest. However, as set forth earlier, the Seventh Circuit has been very clear in its interpretation of *Roth*, noting (in addition to the above cited law) that "at the heart of every claim that an employer

8

has infringed an employee's liberty of occupation, is a charge that the 'circumstances of the discharge, at least if they were publicly stated, had the effect of blacklisting the employee from employment in comparable jobs.'" *Townsend*, 256 F.3d at 670 (quoting *Colaizzi*, 812 F.2d at 307). Even in *Roth*, on which Plaintiffs principally rely, the Supreme Court noted that "[i]t stretches the concept too far to suggest that a person is deprived of liberty when he simply is not rehired in one job but remains as free as before to seek another." 408 U.S. at 575. The Seventh Circuit, in *Townsend* and subsequent cases, has followed suit, repeatedly stating that an adverse governmental action regarding employment or occupation that does not amount to a near total loss of an occupation, even when coupled with "defamatory" government statements, does not give rise to a due process claim. See *Townsend*, 256 F.3d at 670; see also *McMahon v. Kindlarski*, 512 F.3d at 988 (7th Cir. 2008); *RJB Props.*, 468 F.3d at 1011 (7th Cir. 2006); *Beischel v. Stone Bank School Dist.*, 362 F.3d 430, 439 (7th Cir. 2004).

Based on this Court's reading of Seventh Circuit law on occupational liberty – including *McMahon*, decided since Judge Kennelly's ruling – the Court cannot conclude that Judge Kennelly committed a "manifest error of law" in requiring Plaintiffs to show that Defendants called into question their good names, reputations, honor or integrity in a way that made it "virtually impossible" for them to find new employment in their chosen field.

### 2. Plaintiffs' Alternative Argument on the Application of the Facts to the Law

Plaintiffs further contend that even if they were required to prove that they were "virtually unemployable" in order to demonstrate that Defendants violated their due process rights, they provided sufficient evidence to defeat summary judgment on this issue. They allege that during the eight day period between the debarment and the temporary restraining order, they were completely

9

"blacklisted" from being able to engage in their primary line of business. They argue that Judge Kennelly should have measured their status from the time of the debarment until the TRO, rather than after the entry of the TRO. They also contend that they have demonstrated a loss of occupational liberty because they "did not and could not retain other employment in their field of choice when they were debarred because they were completely unable to conduct business, directly or indirectly, with the City of Chicago."

A few things are clear. First, Plaintiffs continue to work in their chosen fields – operating a supply company and, in Massarella's case, consulting on the side. Next, Plaintiffs Loera and Massarella never had any contracts with the City; rather, the contracts were between the City and CUI. And finally, the parties agree that for eight days, before the entry of the TRO, CUI lost the business of its largest customer. The question then becomes whether the eight day period satisfies the Seventh Circuit's requirement that Defendants' actions led to Plaintiffs' "near total loss of an occupation" or, to borrow another phrase, made it "virtually impossible" for Plaintiffs to find new employment in their chosen field. Respectfully, the Court concludes that Judge Kennelly correctly determined that Plaintiffs' eight day forced hiatus does not satisfy the stringent test for infringement of occupational liberty.

At least two roads lead to that result. First, Plaintiffs still operate CUI, and CUI still supplies goods to the City of Chicago. As summarized by the Seventh Circuit:

> The City has reinstated all the cancelled contracts. It has rescinded the debarment. It has adopted a new rule that authorizes, although it does not explicitly require, a hearing before debarment if there are genuine issues of material fact. City of Chicago Debarment Rules, ¶ 7.05(h). (The previous rules made no provision for a hearing.) It has promised [ ] on the record in open court that if termination or debarment proceedings are again instituted against CUI, the contractor will be entitled to a full evidentiary hearing * * * * In light of the promise made by the City, and the City's new rule, we think it highly unlikely that, should the City reinstate its

> termination and debarment proceeding against CUI, it will fail to offer CUI a hearing that satisfies the requirements of due process of law.

*Chicago United Inds., Ltd. v. City of Chicago,* 445 F.3d 940, 946-47 (7th Cir. 2006). What Plaintiffs wanted when they filed this lawsuit – a predeprivation hearing from the City of Chicago – has been granted. Although they were briefly barred from doing business with the City, "[a] liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment." *Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985). This Court does not view an eight day hiatus from supplying goods to the City as a protracted interruption of employment.

Moreover, even if the City had not reinstated the cancelled contracts, Plaintiffs have failed to demonstrate that they have been permanently excluded from their chosen field – running a company that supplies goods to *various* public and private entities.[5] Loera and Massarella never stopped operating CUI, and they have continued to be compensated for their work with CUI. In 2005 (the year of the debarment), each of them received $229,000 in compensation from CUI, and each earned $234,000 from CUI in 2006. Although they suffered a set back in temporarily losing business from their largest customer (and even that was quickly rectified), they have not shown that there are no other customers for CUI's products.[6] As the *Townsend* court found, where a plaintiff

---

[5] Like Judge Kennelly, this Court is not persuaded that Loera and Massarella's occupation can be framed as doing business with the City of Chicago. Loera and Massarella, individually, did not do business with the City. Rather, they run a company that provides goods for governmental and private entities. See, *e.g.*, *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 777 (7th Cir. 1994) ("Shareholders do not have standing to sue for harms to the corporation, or even for the derivative harm to themselves that might arise from a tort or other wrong to the corporation.")

[6] Plaintiffs have not presented evidence to this Court that they have courted or approached other potential customers and been rejected, nor have they put forth sufficient

11

had "many potential employment opportunities * * * available to him and with no demonstration that the [negative] comments have prevented him from obtaining one of the those jobs, [plaintiff] cannot demonstrate that his liberty has been infringed in the manner required by the case law." 256 F.3d at 671-72. If Plaintiffs had shown that they were foreclosed from pursuing their chosen line of work by the debarment, this would be a different case. But what they have shown, at most, is that they lost (for a short time) one customer. Losing one customer – albeit a large one – does not make it "virtually impossible" for Plaintiffs to find employment in their chosen field. See also *McMahon*, 512 F.3d at 988 (defamation does not deprive a person of liberty "even when the defamation causes *serious impairment* of future employment opportunities") (emphasis added).

## III. Conclusion

For the reasons stated above, the Court denies Plaintiffs George Loera and Nick Massarella's motion to reconsider (DE 208) and affirms Judge Kennelly's ruling of December 3, 2007.

Dated: April 29, 2008

_____
Robert M. Dow, Jr.
United States District Judge

---

evidence to demonstrate that they have lost other customers due to the City's actions. See *Zaky v. United States Veterans Admin.*, 793 F.2d 832, 840 (7th Cir. 1986) (explaining that a court should not simply assume, based on a plaintiff's assertions, that a wide variety of opportunities have been foreclosed).

12