**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHICAGO UNITED INDUSTRIES, LTD., ) <br> an Illinois corporation, GEORGE LOERA, ) <br> and NICK MASSARELLA, ) <br> ) <br>     Plaintiffs ) <br> ) <br>         v. ) <br> ) <br> CITY OF CHICAGO, ) <br> MARY DEMPSEY, and ) <br> LOUIS LANGONE, ) <br> ) <br>     Defendants. ) | Case No.: 05-cv-5011 <br><br> Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

This case arises out of a dispute between the City of Chicago and one of its contractors, Chicago United Industries, Ltd. ("CUI"). The nature of Plaintiffs' claims has evolved significantly since the suit initially was filed in August of 2005. In the most recent iteration of the complaint – the Third Amended Complaint – CUI and its owners, Plaintiffs George Loera and Nick Massarella, assert six claims against the City of Chicago (the "City"), Mary Dempsey ("Dempsey"), and Louis Langone ("Langone")[1] (collectively "Defendants"). The Court previously entered summary judgment in favor of Defendants on the individual plaintiffs' claims in Counts I, II, and IV[2], and denied Plaintiffs' motion for reconsideration of that ruling. [203, 249]. Therefore Loera and Massarella are no longer parties to this lawsuit. In addition, the Court dismissed Counts I and II. [109]. The remaining counts allege a procedural due process

---

[1] Dempsey served as the Interim Chief Procurement Officer for the City's Department of Procurement Services ("DPS") from February 7, 2005 through August 31, 2005. Langone is the Director of Administrative Services for the City's Department of Transportation ("CDOT"). Dempsey and Langone have contemporaneously filed a motion for summary judgment based on qualified immunity [274].

[2] The summary judgment order [203] was entered by Judge Kennelly, to whom the case was assigned at the time.

violation against the City and Dempsey (Count III), a First Amendment retaliation claim against all Defendants (Count IV), and breach of contract claims against the City (Count VI). The Third Amended Complaint also seeks injunctive relief (Count V). This matter is before the Court on Defendants' motion for summary judgment [269].[3] For the reasons set forth below, Defendants' motion for summary judgment [269] is granted. Having granted summary judgment on the merits of all of CUI's remaining claims, Defendants Dempsey and Langone's motion for summary judgment based on qualified immunity [274] is denied as moot.

## I.    Background

### A.    Factual Background

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements[4]: Defendants' Statement of Facts ("Def. SOF") [272], Plaintiff's Response to

---

[3] In ruling on Defendants' motion for summary judgment [269], the Court faced a particularly voluminous record. The parties requested and were granted leave to file oversized briefs, as well as more than three times the number of fact statements permitted under L.R. 56.1. Therefore, the Court has before it in excess of 200 pages of summary judgment briefing, more than 350 pages of 56.1 statements and responses, and several boxes of exhibits.

[4] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See*, e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See*, e.g., Malec,* 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec,* 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See*, e.g.*, *Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a party's L.R. 56.1 statement of fact. See*, e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

Defendant's L.R. 56.1 Statement ("Pl. Resp.") [297], Plaintiff's Statement of Additional Facts ("Pl. SOF") [303], and Defendant's Response to Plaintiff's Statement of Additional Facts ("Def. Resp.") [311].[5]

CUI has been doing business with the City of Chicago for more than 20 years as a supplier of various commodities. Pl. Resp. ¶ 8. CUI is wholly owned by George Loera ("Loera") and Nick Massarella ("Massarella"). Pl. Resp. ¶ 1. Loera, who is Hispanic, is a 51% owner of CUI. *Id.* For approximately the past 20 years, CUI has been certified by the City as a minority-owned business enterprise ("MBE"). *Id.*

### 1. The City's MBE/WBE Program

The City's Department of Procurement Services ("DPS"), through its commissioner, the Chief Procurement Officer, is charged by state law and municipal ordinance with entering into, and administering, contracts on behalf of the City. Def. SOF ¶ 9. Defendant Mary Dempsey served as the Interim Chief Procurement Officer for the DPS from February 7, 2005 through August 31, 2005. Def. SOF ¶ 3. Barbara Lumpkin served as Chief Procurement Officer from September 16, 2005 to October 15, 2007. Def. SOF ¶ 21.

The DPS is also responsible for managing the City's Minority-Owned Business Enterprise ("MBE") and Women-Owned Business Enterprise ("WBE") program. *Id.* The MBE/WBE program is designed to support minority and women-owned businesses by awarding

---

[5] Defendants object to Plaintiffs' Statement of Additional Facts on the grounds that Plaintiffs' submission sets forth immaterial facts and contains unsupported assertions of fact and conclusory statements. As noted above, it is the Court's usual practice to disregard improperly supported denials and fact statements, and the Court has done so in this case. Defendants also correctly note that many of Plaintiffs' statements of fact consist of lengthy paragraphs and assert multiple facts, in violation of L.R. 56.1(b)(3)(C)'s requirement a party opposing summary judgment submit a statement of additional facts consisting of "short numbered paragraphs." Defendants have not moved to strike Plaintiffs' statement of additional facts, nor is the Court inclined to do so. However, the Court notes that Plaintiffs' disregard for the local rules is particularly inexplicable in light of the fact that Plaintiffs were given leave to file 144 separately-numbered statements of additional facts, as opposed to the usual 40.

such enterprises a certain percentage of City contracts. Def. SOF ¶ 25. Vendors become MBEs and WBEs by applying for certification with DPS's Certification Unit. Def. SOF ¶ 26.

Once a vendor is certified as an MBE or WBE, it is eligible to bid on "Target Market" contracts, which are City contracts on which only MBEs and WBEs may bid. Def. SOF ¶ 29. To the extent practicable, all contracts of $10,000 or less are to be Target Market contracts. Def. SOF ¶ 30. For all City contracts valued at more than $100,000, the prime contractor is required to spend a certain percentage of the dollar value of the contract with MBE and WBE vendors. Def. SOF ¶ 31. The City's Regulations Governing Certification of Minority and Women-Owned Businesses provide that MBE/WBE certification is limited to an applicant's areas of specialty. See Def. SOF ¶ 32; Certification Regulations, § VIII.I, Def. Exs., Vol. II, Ex. 18. DPS's Compliance Unit is charged with reviewing contracts valued over $100,000 to make sure that they have the appropriate MBE and WBE level of participation and that those MBEs and WBEs are certified in the contract areas in which they are participating. Def. SOF ¶ 33.

If a prime contractor wants to replace the MBE subcontractor on its contract with another MBE, or if it desires a waiver of its initial MBE goals, it must follow the procedure set forth in the City's Contract Monitoring & Compliance Procedures. Pl. SOF ¶ 120. The only DPS unit authorized to permit substitutions of MBE or WBE subcontractors by the prime contractor is the Contract Monitoring and Compliance Unit. Def. SOF ¶ 36.

Section 2-92-490(g) of the Chicago Municipal Code directs the contract compliance officer, in coordination with the chief procurement officer, to establish procedures that are consistent with the principles of due process of law for the decertification of MBEs and WBEs. Def. SOF ¶ 37. Pursuant to that directive, the DPS has issued decertification regulations, which require notice and a hearing prior to any decertification. Def. SOF ¶ 38.

In 2005, the City required all MBEs and WBEs to re-apply for certification. Def. SOF ¶¶ 13, 153. While MBE and WBE vendors' new applications were pending, they were issued courtesy letters, which continued their certification for a specified number of months. Def. SOF ¶ 154. After reapplying, CUI received its certification in November 2007. Def. SOF ¶ 153.

On March 3, 2005, Dempsey issued a memorandum to all vendors stating, among other things, that if a vendor is proposed for decertification or debarment, that vendor is permitted to continue performing on its existing contracts with the City until a decision is made by DPS on the proposed action. Def. SOF ¶¶ 39, 42. The March 3, 2005 memorandum also stated that, unless and until the Chief Procurement Officer makes a final decision on the proposed debarment or decertification, "the firm or individual is not precluded from bidding on any future contracts." Def. SOF ¶ 41. In addition to vendors, the memorandum was sent to City of Chicago Commissioners and several City of Chicago sister agencies and entities. Def. SOF ¶ 42.

### 2. City Notifies CUI of Its Intent to Decertify CUI as an MBE and Its Intent to Debar CUI

On March 17, 2005, the City issued a Preliminary Notice of Intent to Decertify CUI as an MBE based on the allegation that CUI was operating as a broker.[6] Def. SOF ¶ 11. In April 2005, CUI submitted a written response to the notice of intent to decertify. Def. SOF at ¶ 12. The City never issued a formal decision regarding CUI's MBE certification as it pertained to the March 17 notice, and CUI was never formally decertified. Def. SOF ¶ 13. CUI remains a certified MBE to this day. *Id.*

On March 31, 2005, the City issued a notice of intent to debar CUI from doing business with the City based on the allegation that CUI had submitted a false shipping ticket in connection

---

[6] As a matter of both City ordinance and DPS policy, MBEs and WBEs cannot be brokers, meaning they cannot simply act as a conduit by purchasing or receiving supplies from a third party supplier rather than out of their own existing inventory. Def. SOF ¶ 28.

with a delivery of aluminum sign blanks (unpainted traffic signs) to the City's Department of Transportation ("CDOT"). Def. SOF ¶ 14. On April 29, 2005, CUI submitted a written response to the notice of intent to debar. Def. SOF ¶ 15.

No further official action was taken with respect the notice of intent to debar CUI until August 24, 2005, at which time the City debarred CUI and its owners from doing business with the City. Def. SOF ¶ 16. The City immediately terminated all existing contracts that it had with CUI based on CUI's debarment. Def. SOF ¶ 17. The Third Amended Complaint alleges that the decision to debar CUI was based largely on Defendant Langone's claim he had hand counted a shipment of 12,000 sign blanks from CUI, and that the shipment was short by 222 signs. Plaintiffs maintain that Langone could not possibly have counted the signs by hand twice in twenty-four hours as he claimed. On August 30, 2005, Plaintiffs filed the instant suit, seeking an injunction against enforcement of the debarment. Def. SOF ¶ 18. The following day, Judge Shadur, the district court judge assigned to the case at that time, entered a temporary restraining order enjoining the Defendants from enforcing the debarment and from canceling any of CUI's existing contracts with the City. Def. SOF ¶ 19.

### 3. Events of March 2005 – August 2005

As noted above, the City never formally decertified CUI, and did not debar CUI until August 24, 2005. However, according to CUI, between the time that the City issued the notices regarding CUI's potential decertification and debarment and the filing of this suit, the City avoided doing business with CUI, thereby effectively revoking its MBE certification or "de facto decertifying" CUI. As discussed below, in support of its de facto decertification claim, CUI contends that between March and August of 2005 the City essentially stopped doing business with CUI by reducing orders on CUI's contracts, refusing to award contracts to CUI, refusing to

extend CUI's contracts, and improperly allowing prime contractors to replace CUI as their MBE subcontractor.

### a.     The City Reduces Orders on Contracts with CUI

Michelle Power, CUI's bookkeeper, testified that beginning in March or April of 2005, CUI experienced a noticeable decrease in orders from the City.  Pl. SOF ¶ 30.  Power testified that it was at least six to nine months before CUI slowly saw an influx of orders from the City again.  *Id.*  CUI's account manager, Michelle Massarella, also testified that leading up to March 2005, orders from the City slowed down.  *Id.*

Between April and August of 2005, the City had 49 contracts with the City, Pl. SOF ¶ 84, all of which were Depends Upon Requirement ("DUR") contracts, meaning that, under the terms of the contracts, the City was authorized to increase or decrease the quantity of goods it ordered based on its needs.  See Pl. Resp. ¶ 208-10.  CUI's records show that between June and August of 2005, the City placed a total of 21 orders on those 49 contracts.  Pl. SOF ¶ 86.  By contrast, between June and August of the previous year, the City placed 180 orders on the same 49 contracts.  *Id.*  CUI's records also show that between April and August of 2005 the City placed no orders on 26 of its 49 contracts with CUI.  Pl. SOF ¶ 84.  During the same time span the prior year, the City placed had 99 orders on those same 26 contracts.  Pl. SOF ¶ 85.  However, CUI's records also show that between April and August of 2004, the City placed no orders on 14 of the 26 contracts on which it placed no orders the following year.  Def. Resp. ¶ 85.  Moreover, 5 of the 26 contracts on which the City placed no orders in the summer of 2005 expired during the disputed period.  Def. Resp. ¶ 85.  Finally, the bulk of the 99 orders placed in 2004 were on the sewer brick contract (41 orders), which expired prior to the disputed period.  Def. Resp. ¶ 85.

### b.      City's Refusal to Award Contracts to CUI

On three occasions during the summer of 2005, CUI was not awarded City contracts based on the DPS's determination that CUI was a so-called non-responsible vendor. Specifically, on June 8, 2005, DPS sent Loera a letter signed by Dempsey, stating that CUI's bid for the Piranha Hydraulic Ironworker and Accessories contract was rejected because CUI "has been deemed as a non-responsible vendor." Def. SOF ¶ 45. DPS sent Loera similar letters, also signed by Dempsey, on July 21, 2005 (rejecting CUI's bid for the Segway Human Transport Units contract) and on July 25, 2005 (rejecting CUI's bid for the Plastic Containers for Narcotics Seizures contract). Def. SOF ¶¶ 46, 48.

Dempsey and Brandie Knazze, the purchasing manager of DPS's small orders unit, testified that a non-responsible vendor is one that the City has determined is not a responsible entity with whom the City should contract based on the vendor's performance on prior contracts, financial capacity, and ability to fulfill the terms and conditions of the contract. Def. SOF ¶ 44. The letters informing CUI of the non-responsible bidder determinations did not mention the March notice of intent to decertify or CUI's MBE certification status, nor did the letter explain why CUI had been deemed a non-responsible vendor. Pl. Resp. ¶ 49.

On six other occasions during the summer of 2005 the City failed to award contracts to CUI despite the fact that CUI was the lowest bidder. Specifically, in June of 2005 CUI was the lowest bidder on a contract for air conditioners for the fire department. See Pl. Apx. Vol. VIII, Ex. I-1, Jun. 2, 2005 Bid Tab. On June 17, 2005, City employee Tom Daily sent an e-mail to DPS's Knazze stating that "[t]he lowest bidder for the air conditioners is Chicago United," and asking whether he could "recommend this vendor or do I disqualify them because of the problems they currently have with DPS[?]" Pl. SOF ¶ 65. The quantities on the bid specification were then changed, and CUI's bid was rejected. *Id.*

In June or July of 2005, CUI was the sole bidder on a contract for rental of tables and chairs for Senior Fest 2005. Pl. SOF ¶ 66. An e-mail dated July 26, 2005 from Dorothy Gardner to Pamela Pagone of the City states that "the City of Chicago is not doing business with [CUI] at this time," and that the contract would be rebid. *Id.* CUI was not awarded the contract, which was eventually awarded on August 29, 2005, while CUI was debarred from doing business with the City. Def. Resp. ¶ 66.

On July 21, 2005, CUI was the lowest bidder on a contract for helix light poles. Pl. SOF ¶ 67. This contract was awarded to another contractor on August 29, 2005, at which time CUI was debarred from doing business with the City. Def. Resp. ¶ 67.

Also on July 21, 2005, CUI was the lowest bidder on a contract for reinforced rod formed steel cages. Pl. SOF ¶ 68. This contract was awarded to another contractor on September 8, 2005. Pl. Apx. Vol. VIII, Ex. I-13. In a March 30, 2006 letter, Michael Picardi, the Commissioner for the City's Department of Streets and Sanitation, informed CUI that "DPS refused to consider CUI's sample because at the time of submission your company was on the disbarred list." Def. Resp. at ¶ 68; Pl. Resp. at ¶ 55.

On August 16, 2005, CUI was the lowest bidder on a contract for manhole and catch basin frames and perforated lids. Pl. SOF ¶ 69. This contract was awarded to another contractor on September 7, 2005. *Id.* The Award Checklist for this contract was prepared by Contract Administrator Patricia Farina on August 24, 2005, during the time period that CUI was debarred from doing business with the City. Def. Resp. ¶ 69.

On August 24, 2005 – the same day CUI was debarred – CUI was the sole bidder on a contract for large sewer pipes. Pl. SOF ¶ 70. On that day, Dempsey wrote a letter to CUI rejecting CUI's bid. *Id.*

### c. City's Refusal to Extend Existing CUI Contracts

DPS employees, including Lorel Blameuser (unit manager for all commodities contracts) and Claude Humphrey (Deputy Procurement Officer for Contract Administration), testified that the City typically utilizes available contract extensions where the vendor has performed satisfactorily on the contract, the cost of goods has not changed or a reasonable price increase is approved, and the City's requirements and funding on the contract have not changed. Pl. SOF ¶ 72. Various CUI employees, including Loera, Gabriela Jaime (CUI's contract specialist), and Michelle Massarella, testified that the City had almost always extended CUI's contracts prior to April 2005. Pl. SOF ¶ 74. John O'Brien (DPS's unit manager for the Contract Division unit of Vehicles and Heavy Equipment) and Lumpkin testified that the Chief Procurement Officer has the ultimate authority to decide whether to approve or reject contract extensions. Pl. SOF ¶ 73.

CUI identifies six contracts that expired between April and August of 2005 that the City elected not to extend.[7] Pl. SOF ¶ 76. The City also failed to extend a seventh contract with CUI – the sewer brick contract – around the time the City issued the notice of debarment and decertification letters. The sewer brick contract was set to expire on February 28, 2005. Pl. Resp. ¶ 50. In January 2005, CUI requested a one year extension of the sewer brick contract as well as a 3% price increase. *Id.* On February 23, 2005, Dempsey issued a letter to CUI stating that the City had elected to extend CUI's sewer brick contract for 730 days and to grant the 3% price increase. *Id.*; Pl. Apx. Vol. VIII, I-44. Humphrey testified that sometime between February and May of 2005, while CUI's contract extension was pending, the City Water Department needed sewer bricks. Def. SOF ¶ 51; Humphrey Dep., 142-44. CUI refused to

---

[7] These include: Horse Feed, Spec/Contract #Bl-32552-01, expired 4/30/05; Fire Hose Accessories, Spec/Contract #Bl-34099-01, expired 4/30/05; Traffic Signs and Pavement Markings, Spec/Contract #B2-96880553, expired 6/14/05; Incandescent Traffic and Pedestrian Signals, Spec/Contract #Bl-5508804, expired 6/30/05; Liquid Caustic Soda, Spec/Contract #B1-8857802, expired 7/31/05; Valve Operating Tools, Spec/Contract #B2-67015-01, expired 7/31/05. Pl. SOF at ¶ 76.

deliver the brick until the contract was formally modified and extended because CUI had experienced problems getting paid in the past. See *id.*; Pl. Resp. ¶ 51. Instead of formally extending the sewer brick contract with CUI, the City placed an emergency order for sewer bricks with Joseph Metz & Sons. Def. SOF ¶ 52. By buying the sewer bricks from Joseph Metz & Sons on an emergency basis, the City paid $57,752.35 (or 42.4%) more than it would have under an extension of CUI's contract with the price increase. Pl. Resp. ¶ 51; Humphrey Dep. 157-58. On May 24, 2005, Dempsey wrote a letter to CUI terminating the sewer brick contract "due to [CUI] being unable to continue and maintain the original contract terms and conditions." Def. SOF ¶ 51.

### d. Internal DPS Discussions Regarding CUI's Certification Status

Humphrey testified that between March and August 2005, there were numerous conversations within DPS about CUI and its MBE certification and projects, including conversations involving Dempsey. Pl. SOF ¶ 39. Humphrey testified that in the spring of 2005 he was under the impression that CUI's MBE certification had expired or was about to expire. *Id.* Sometime after April 2005, Humphrey and Blameuser spoke with Dempsey and Lori Lightfoot, the then-Interim First Deputy Procurement Officer, about CUI's MBE certification status. Pl. SOF ¶ 40. According to Humphrey, Dempsey told them that CUI was under evaluation, and that no final decision regarding its certification had been made. *Id.* Humphrey further testified that, at that meeting, "we were given a directive [by Lightfoot] to handle Chicago United on a normal basis, business as usual, in regards to their projects." Def. Resp. ¶ 40; Humphrey Dep. p. 45-46.

In July 2005, Humphrey again spoke with Lightfoot about CUI. Pl. SOF ¶ 41. At that time, she advised him that CUI was going to be debarred and that prime contractors should be informed that they could no longer get MBE credit for using CUI as a subcontractor. Pl. SOF ¶

41; Def. Resp. ¶ 41. A day or two later, Aileen Velasquez (a deputy procurement officer) told Humphrey that it was "business as usual" with CUI. Pl. SOF at ¶ 41; Humphrey Dep. p. 60. Humphrey testified that his staff "had started to reach out to firms and * * * had to backtrack." Def. Resp. ¶ 41; Humphrey Dep. p. 61.

Blameuser testified that while the "letter * * * was pending regarding [CUI's] decertification, as well as their pending of their debarment," the contract administration department "didn't know what was exactly happening" with CUI. Blameuser Dep. p. 83-84. According to Blameuser, her manager Aileen Velazquez and Humphrey told her that everything was in a state of flux with CUI at that time. Pl. SOF ¶ 42; Blameuser Dep. p. 85, 140. Blameuser's notes from a May 24, 2005 DPS staff meeting state: "CUI – no new projects as a prime or subcontractor allowed." Pl. SOF ¶ 45. Blameuser's notes from a June 7, 2005 staff meeting read: "CUI, No extension of contracts with extension opinions * * * No final on their status. Certification/decertification." *Id.*

Theresa McDonnell, head purchase contract administrator within the Work Services Division of DPS, testified that in March of 2005, Blameuser told her that anything related to CUI was "on hold" until a decision was made regarding CUI's certification. Pl. SOF ¶ 38. McDonnell further testified that Humphrey directed her to replace CUI as the MBE subcontractor on a contract because its certification "was being looked at." McDonnell Dep. p. 46-47. According to McDonnell, Humphrey also told her to bring anything having to do with CUI to his attention because CUI's certification was in question and was being reviewed by management. Pl. SOF ¶ 46; McDonnell Dep. p. 25.

Knazze testified that she was aware that, as a rule, vendors who were proposed for decertification we not to be treated any differently than other vendors. Pl. SOF ¶ 50. However,

she further testified that her manager, Aileen Velasquez, told Knazze to see her before taking any action regarding vendors who were proposed for decertification, including CUI, which Knazze did. *Id.*

Tom Wolfe, an employee of the City's Water Department, testified that in or about August 2005, Gigi Brooms, the assistant to the commissioner of contracts in DPS, told him he "couldn't use" CUI. Pl. SOF ¶ 31. He testified that he did not know whether this directive was related to debarment and/or decertification proceedings against CUI. Wolfe Dep. p. 25. Wolfe testified that his department had an emergency need for tapping sleeves and valves at that time, and that he did not solicit a quote from CUI for the goods as a result of the directive. Pl. SOF ¶ 32.

On June 6, 2005, O'Brien sent an email to Lightfoot (cc'ing Dempsey, among others), asking whether CUI had been decertified. Pl. SOF ¶ 48. In that e-mail O'Brien stated that he had advised two prime contractors – Standard Truck Center, Inc. and Standard Equipment Company – that they could no longer receive MBE credit for using CUI as a subcontractor. *Id.*

On April 16, 2005, Dempsey wrote and signed a memorandum to Miguel d'Escoto, Commissioner of CDOT, with a CUI invoice for sign blanks attached, stating, "Is CDOT still ordering from Chicago United Industries? An explanation of the attached would be appreciated in light of the serious concerns raised earlier by CDOT concerning this vendor." Pl. SOF ¶ 52.

### e. Statements by City Employees to Prime Contractors Regarding CUI's Certification Status and Replacement of CUI as an MBE Subcontractor on City Contracts

McDonnell testified that she told two vendors – Midwest Service Center, Inc. ("Midwest") and Air One Equipment ("Air One") – to replace CUI as an MBE subcontractor during the summer of 2005. Def. Resp. ¶ 46. In the summer of 2005, Midwest submitted paperwork to DPS proposing to use CUI as an MBE subcontractor on its contract with the City

for centrifugal pumps. Def. SOF ¶¶ 88, 92. McDonnell testified that she requested that Midwest replace CUI at the request of her manager, Humphrey, because CUI's certification was under review. Def. SOF ¶ 93. Midwest replaced CUI as an MBE subcontractor on the centrifugal pumps contract. Def. SOF ¶ 94.

In the summer of 2005, Air One submitted paperwork to DPS seeking to renew a contract with the City on which CUI was an MBE subcontractor. Def. SOF ¶ 95. Air One sought to continue to use CUI as an MBE subcontractor. Def. SOF ¶ 96. The parties dispute whether Air One submitted a current MBE certification letter for CUI. Def. SOF ¶ 96; Pl. Resp. ¶ 96. McDonnell testified that she told Air One to replace CUI as an MBE because the documentation submitted by Air One showed that CUI's certification had expired. Def. SOF ¶ 98; McDonnell Dep. p. 22-25. However, according to Air One's President, Sandra Frey, McDonnell told her to replace CUI because they were going to be debarred and/or decertified. Pl. SOF ¶ 55. Air One re-submitted the documentation to McDonnell, again seeking to use CUI as a subcontractor. Def. SOF ¶ 99. On September 2, 2005, McDonnell advised Air One that the contract renewal would be approved using CUI as an MBE subcontractor. Pl. Resp. ¶ 99.

O'Brien testified that in June of 2005, he informed two City vendors – Standard Truck Center, Inc. and Standard Equipment Company – that they could no longer receive MBE credit for using CUI as a subcontractor. Pl. SOF ¶ 53. As a result, Standard Truck elected to replace CUI as its subcontractor; Standard Equipment did not. *Id.*; Def. Resp. ¶ 53. Monica Cardenas, the Deputy Procurement Officer over DPS's Contract Compliance and Monitoring Unit, testified that Standard Truck's substitution of CUI as an MBE subcontractor was done without the approval of the Contract Compliance and Monitoring Unit and was not done in accordance with Compliance rules. Def. SOF ¶ 81.

Another prime contractor, Scrub, Inc., also replaced CUI as its MBE subcontractor on a City contract during the summer of 2005. Pl. SOF ¶ 59. The change was approved by Claude Humphrey. *Id.* Humphrey testified that Scrub, Inc. wanted to replace CUI as a subcontractor because CUI's prices were too high. Def. SOF ¶ 70. Consistent with Humphrey's testimony, CUI's vice president, Nick Massarella, testified that Scrub wanted CUI to accept a price decrease. Def. SOF ¶ 72. The parties agree that Humphrey's actions were inconsistent with DPS policy regarding the substitution of an MBE. Pl. Resp. ¶ 72; Def. SOF ¶ 73.[8]

### f. Dempsey and the City's Failure to Respond to CUI Inquiries

CUI employees testified that after March 2005 communications with the City fell off and the City did not respond to their inquiries. Pl. SOF ¶ 33. Between April and August of 2005, Loera sent approximately twelve letters to Dempsey and other City officials regarding issues with CUI's bids, contracts, extensions and price increase requests, and MBE certification status.[9] Pl. SOF ¶ 34. CUI received no response to these letters. *Id.*

---

[8] Nick Massarella testified that three prime contractors informed him that they had been told by City employees that they could not get MBE credit for using CUI as a subcontractor. Pl. SOF ¶ 57. This evidence is hearsay: "an out-of-court statement offered to prove the truth of its contents" – namely to prove that City employees in fact informed prime contractors that CUI was decertified, and therefore "is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

[9] Nine of the letters were addressed to Dempsey, including: 4/8/2005 letter regarding Notice of Intent to Decertify CUI; 4/29/2005 letter regarding Notice of Proposed Debarment of CUI; 6/16/2005 letter requesting a meeting; 7/7/2005 letter requesting clarification of the meaning of a "non-responsible" vendor; 7/18/2005 letter requesting clarification of the meaning of a "non-responsible" vendor; 7/18/2005 letter requesting intervention with Scrub Inc.'s removal of CUI as an MBE subcontractor; 7/22/2005 letter regarding Theresa McDonnell telling two vendors not to do business with CUI; 8/3/2005 letter regarding notice of intent to debar; 8/3/2005 letter regarding notice of intent to decertify. Pl. SOF at ¶ 34. Dempsey was cc'd on the remaining three letters, including: 6/21/2005 letter to Monica Cardenas regarding Scrub, Inc.'s removal of CUI as an MBE subcontractor; 8/9/2005 letter to Brian Murphy (Commissioner, Department of Water Management) regarding sewer brick contract; 8/9/2005 letter to Michael Picardi (Commissioner, Department of Streets and Sanitation) complaining that CUI did not receive awards for three contracts on which it was the lowest bidder. *Id.*

### 4. CUI Files the Instant Suit on August 30, 2005

On August 24, 2005 the City delivered notices of debarment to CUI and its owners and immediately terminated its existing contracts with CUI. Def. SOF ¶¶ 16-17. Six days later, on August 30, 2005, Plaintiffs filed the instant suit, seeking an injunction against enforcement of the debarment. Def. SOF ¶ 18. The following day, Judge Shadur entered a temporary restraining order enjoining the Defendants from (1) enforcing the debarment of CUI and its owners, (2) canceling any existing contracts with CUI, and (3) conducting any further decertification or administrative hearing regarding, related to or based upon the issue of debarment. Def. SOF ¶ 19. On September 20, 2005, Lumpkin – who had recently replaced Dempsey as Chief Procurement Officer – rescinded the August 24, 2005 debarment decision and cancellation of CUI's contracts, without prejudice to reinstating debarment proceedings at a later date regarding the fraudulent shipping ticket. Def. SOF ¶ 22.

### 5. Events Following Filing of This Suit

#### a. City Funnels Communications with CUI Through A Single DPS Contact

On September 1, 2005, Lightfoot sent a letter to CUI's counsel stating that, going forward, the DPS would only communicate with CUI in writing, and that all written communications should be directed to Aileen Velasquez. Pl. Apx. Vol. VII, Ex. G-29, Ltr. Lightfoot to Bosco, Sept. 1, 2005. Lightfoot testified that as early as July 2005 DPS had tried to have a central point of contact for CUI because Loera was "in the habit of calling lots of different people multiple times of day asking questions about everything under the sun." Def. Resp. ¶ 92. Humphrey testified that at some point Velasquez told him not to communicate with CUI, and to funnel all communication through her because having multiple points of contact was disruptive and was resulting in CUI getting conflicting information. Pl. SOF ¶ 94; Humphrey Dep. 62-63.

Some time prior to October 5, 2005 Blameuser was added as a second DPS contact person for CUI. Def. SOF ¶ 179.

Loera testified that, as a result of the communication restriction, CUI was unable to obtain information in a timely manner to submit adequate responses to outstanding bids, and that he believed that CUI may have lost business with respect to orders on its existing contracts. Pl. SOF ¶ 99. However, Loera could not identify any orders, contracts, or business opportunities CUI did not receive as a result of the restrictions on communications. Def. Resp. ¶ 99.

### b. Failure or Reluctance to Award CUI Contracts

#### 1. Library Shelving Contract

In July of 2006, CUI placed a bid for a contract to provide library shelving to the City. Pl. SOF ¶ 127. Progressive Industries submitted the lowest bid on that contract, and was awarded the contract on August 7, 2006. Def. SOF ¶ 139. Progressive Industries was not a certified MBE or WBE at the time, and did not receive WBE certification until February 22, 2007. Pl. SOF ¶ 127. However, Progressive submitted to the City with its bid a Target Market Schedule D-2 stating, under penalties of perjury, that Progressive was a WBE subcontractor. Def. SOF ¶ 140. The second lowest bidder on the contract was Computer Products & Supply, Inc.; CUI was the third lowest bidder. Def. SOF ¶ 139. On June 26, 2007, Chicago Public Library Director of Procurement Maria Ligammari sent an e-mail to Olivia Boyd and Brandie Knazze, requesting, on behalf of "the Commissioner," information about bidding for the library shelving contract, including who bid and their bids. Pl. Resp. ¶ 136.

#### 2. Library Racks Contract

In December of 2006, CUI was the sole bidder for a contract to provide storage racks to the City for the Chicago Public Libraries. Pl. SOF ¶ 128. CUI's bid was rejected for the stated reason that CUI was not certified in that area of specialty. Def. SOF ¶ 133; Pl. Resp. ¶ 134. The

City re-bid the contract in January 2007, and CUI was again the sole bidder. Pl. SOF ¶ 128. DPS accepted CUI's second bid, despite the fact that it still was not certified for this particular commodity. *Id.*

The parties dispute whether the City requires MBEs to be certified in a particular area of specialty on target market contracts valued at under $100,000. Loera and Massarella testified that the City did not require CUI to be certified in a particular area of specialty on such contracts until after CUI filed its law suit. Pl. SOF ¶ 119; Pl. Resp. ¶ 134. By contrast, Brandie Knazze testified that MBEs and WBEs are required to be certified in the area of specialty on target market contracts valued at under $100,000, but that that requirement can be waived in certain circumstances. Def. Resp. ¶ 118. For example, Knazze testified that if there are no MBEs certified in a particular area of specialty for a contract, the City can award that contract to an MBE without certification in the area of specialty. Pl. SOF ¶ 118. Knazze also testified that whether the City waives the specialty certification requirement on small orders depends on how many MBEs or WBEs were certified in the area of specialty, the capacity for the project, and the commodity being purchased. Def. Resp. ¶ 118.

### 3. Recycling Carts Contract

In early 2006, the City had a new recycling carts contract that it initially sought to award as a sole source contract. Def. SOF ¶¶ 128-29. Typically, contracts are bid as sole source when only one vendor can produce a particular commodity. Pl. SOF ¶ 129. Loera testified that recycling carts are available from multiple sources, implying that the City's attempt to bid the contract as sole source was improper. Pl. SOF ¶ 130. When the City was pursuing a sole source contract, it solicited quotes on the recycling carts contract only from manufacturers. Def. SOF ¶ 129. Therefore, the City did not allow vendors and distributors – including CUI – to bid on the contract. Pl. SOF ¶ 130. The City informed Zarn, a manufacturer of recycling carts that sought

to use CUI as its distributor on the contract, that CUI could not bid directly on the contract because it was not a manufacturer, but that Zarn could use CUI as its MBE. Pl. Apx. Vol. IX, Ex. I-57. Loera testified that, in his experience, the City did not usually solicit to bids from manufacturers. *Id.* The City eventually abandoned its decision to bid the contract as sole source, let the contract out for competitive bidding, and awarded the contract to CUI. Pl. SOF ¶ 131.

### 4. Emergency Purchase of Street Signs

From 2000 to 2005, CUI held a contract with the City for aluminum sign blanks; that contract expired in July 2005. Def. SOF ¶ 187; Pl. SOF ¶ 138. Between March 24 and March 31, 2006, the City entered into four emergency contracts with Lanan Products, one for aluminum sign blanks and three for pre-made signs.[10] Def. SOF ¶ 185; Pl. SOF ¶ 139. Lumpkin testified that emergency purchases are not to exceed $250,000. Pl. SOF ¶ 137. Here, in a week's time, the City made three emergency purchases of pre-made signs. Each individual purchase fell below the $250,000 cap; together the three purchases totaled $492,266.

As a matter of state law, the City's emergency contracts are not publicly bid or advertised. Def. SOF ¶ 186. Rather, the appropriate User Department (here, CDOT) solicits quotes from the vendors of its choice. *Id.* The City did not solicit quotes from CUI on these emergency contracts. Pl. SOF ¶ 139. Defendant Langone, CDOT's Director of Administrative Services, testified that the decision not to solicit bids from CUI was made by Cheri Heramb (the Acting Commissioner for CDOT), Gilberto Quinones (assistant commissioner for CDOT in 2005), Claude Humphrey, Aileen Velasquez, and himself. Langone Dep. 139. However, Quinones testified that, generally, he did not have any involvement in deciding which companies

---

[10] Specifically, on March 24, 2006, the City awarded Lanan a contract for $249,950 in aluminum sign blanks and a contract for $134,222 in pre-made aluminum signs. Pl. SOF ¶ 140; Def. Resp. ¶ 140. On March 31, 2006, the City awarded Lanan two contracts for pre-made aluminum signs; one for $220,450, and one for $137,594.

were solicited for bids on emergency purchases, and that he was not involved in the decision not to solicit bids from CUI in this instance. Quinones Dep. 39-41, 45. Langone testified that CDOT decided not to solicit CUI for quotes on the March 2006 emergency contracts because of CUI's "past performance and delivery." Def. SOF ¶ 187. As noted above, an allegation that CUI submitted a false shipping ticket in connection with this contract was the basis for CUI's debarment. Also, on August 17, 2005, Heramb sent Dempsey a letter detailing CUI's history of late deliveries on its aluminum sign blanks contract. Def. SOF ¶ 188. According to that letter, CUI had taken anywhere from 248 days to 399 days to deliver some of the ordered sign blanks, while the contract required them to deliver within 14 hours of receiving a City order. *Id.*

### c. Failure to Extend CUI's Contracts

CUI identifies eight contracts that expired since the filing of this lawsuit that the City elected not to extend.[11] Pl. SOF ¶ 76. According to the City, two of those contracts – the Police Protection Equipment contract and the Corrugated Cartons and Sheets contract – were not extended because CUI failed to submit the required documentation to the City. Def. SOF ¶¶ 146, 148. Two other contracts – for Ballast Housing Bases and Band-It tools – were not extended, according to the City, because the City revised the bid solicitation. Def. SOF ¶¶ 144, 145. CUI contends that the City nevertheless should have granted extensions to CUI on these two contracts because any changes in the bid solicitations were slight, if any. Pl. Resp. ¶¶ 144, 145. The City has extended at least 14 contracts with CUI since the filing of this suit. Def. SOF ¶ 152.

---

[11] These include: Solar Powered Hazard Lights, Spec/Contract #B2-55096-01, expired 10/7/05; Parts and Accessories for Band-It Tools, Spec/Contract #B2-28581-02, expired 10/31/05; Ballast Housing Bases, Spec/Contract #B2-28576-02, expired 10/31/05; Corrugated Cartons, Spec/Contract #B2-64025-01, expired 4/30/06; Police Protection Equipment, Spec/Contract #8247 (RFQ 640), expired 12/31/07; Fingerprint Equipment and Supplies, Spec/Contract #B3-68048-04, expired 5/19/06; Parts and Service for Traffic Control, Spec/Contract #5991 (602), expired 10/31/06; Photographic Supplies, Spec/Contract #B2-65575-01 A, expired 5/13/06. Pl. SOF at ¶ 76.

### d. Miscellaneous Allegedly Retaliatory Acts

#### 1. Issuance of Courtesy Letters Temporarily Extending CUI's Certification

As noted above, in 2005 all MBEs and WBEs were required to re-apply for certification. Def. SOF ¶¶ 13, 153. While MBE and WBE vendors' new applications were pending, they were issued courtesy letters, which temporarily continued their certification. Def. SOF ¶ 154. Lumpkin testified that, typically, a courtesy extension letter would be good for six months, but that that duration could vary. Lumpkin Dep., p. 130-31. Lumpkin also testified that "a number of firms * * * had month-to-month certification letters." *Id.* at 182.

Between December 2005 and November 2007, when its MBE recertification application was approved, CUI received courtesy letters that lasted for between one and three months. Pl. SOF ¶ 111. CUI's expert opines that the uncertainty regarding CUI's MBE status, coupled with the short courtesy extensions, contributed to a loss of business opportunity for CUI. Pl. Resp. ¶ 155. Lumpkin testified that CUI always was able to submit bids for new contracts based on the courtesy letters regardless of their length. Def. Resp. ¶ 112.

#### 2. Removal of CUI's Certification in the Specialty Area of Automotive Supplies and the Resulting Cancelation of the NAPA Contract

Prior to October 26, 2004, CUI was certified in the areas of specialty of Motor Fuel and Automotive Supplies. Def. SOF ¶ 168. CUI had provided motor oil to the City based on its certification in those specialty areas. Pl. SOF ¶ 113. Beginning in October 2000, CUI also provided various motor oils and fluids as an MBE subcontractor on the City's contact with Genuine Parts Company d/b/a NAPA ("NAPA"). Def. SOF ¶ 165.

In 2004, the City re-evaluated the manner in which it determined whether MBEs and WBEs were suppliers, distributors and/or brokers with respect to commodities. Def. SOF ¶ 167.

As part of this re-evaluation, the City conducted an audit of MBE firms, including CUI. *Id.* Following the audit, the City sent CUI a letter revising its areas of MBE certification; that letter, dated October 26, 2004, removed Motor Fuel and Automotive Supplies from CUI's MBE certification. Def. SOF ¶ 168.

In the fall of 2005, CUI was awarded a contract to provide motor oil to the City. Def. SOF ¶ 174. On October 14, 2005, Lumpkin informed CUI that because it was not certified to provide motor oils it could not serve as its own MBE on the motor oil contract. Pl. SOF ¶ 113; Def. SOF ¶ 175.

The NAPA contract came up for an extension in 2006; NAPA sought to again use CUI as an MBE subcontractor to provide hydraulic fluids, anti freeze, trans fluids, greases, and certain oil products on the contract. Pl. SOF ¶ 115. On September 19, 2006, Monica Cardenas, manager of DPS's Contract Monitoring and Compliance Unit, told NAPA that it could not get MBE credit for using CUI as its subcontractor because CUI was not a certified MBE with respect to the commodities at issue. *Id.* NAPA did not use CUI as its MBE subcontractor on the contract extension. *Id.*

Cardenas testified that NAPA was permitted to get MBE credit for using CUI as a subcontractor on the contract between October 26, 2004 and September 2006 – despite the fact that CUI was not certified in the relevant specialty area during that time – because the September 2006 renewal was the first opportunity DPS's Compliance Division had to review CUI's certification with respect to that particular contract. Def. SOF ¶ 117. According to Cardenas, once contracts are in place, DPS's Compliance Division has no way to automatically monitor the certification of MBE and WBE subcontractors on a contract-by-contract basis. *Id.* Rather, the Compliance Division generally monitors whether the MBE and WBE subcontractors on a

particular contract are properly certified only at the beginning of the contract and at the renewal stage, when new paperwork regarding certification is submitted.

### 3. DPS Discussions with Standard Equipment Regarding Its Use of CUI as an MBE

In November of 2006, Cardenas and Luz Reyes met with Gerald Donlon and Andrew Carter of Standard Equipment Company regarding MBE compliance issues and shortfalls. Pl. SOF ¶ 122. According to Donlon, at this meeting, Cardenas repeatedly asked Donlon and Carter why they wanted to continue using CUI as an MBE on Standard Equipment Company's contract with the City, and informed Donlon and Carter that the City would look favorably upon an application by Standard Equipment Company to replace CUI as its MBE subcontractor, and that Standard Equipment Company would be able to obtain a waiver if it chose to remove CUI as its MBE subcontractor. *Id.* Cardenas testified that she did not make these statements. Def. SOF ¶¶ 156-57. Standard Equipment did not remove CUI as an MBE subcontractor on any of its contracts. Def. Resp. ¶ 122.

### 4. Midwest Service Center's Failure to Use CUI

In September of 2002, the City awarded Midwest Service Center ("Midwest") a large electric motors contract. Pl. SOF ¶ 123. CUI was the MBE subcontractor providing electrical motor parts on that contract. *Id.* Under the contract, Midwest was required to pay CUI 16.9% of money paid by the City on the contract. *Id.* In the spring of 2006, Midwest was not meeting its obligation to pay CUI the required percentage under the contract. *Id.* On May 24, 2006, Cardenas and Reyes met with Midwest to discuss Midwest's shortfall with respect to CUI. Pl. SOF ¶ 123. At that meeting, Midwest indicated that it did not want to use CUI on the contract any longer. *Id.* According to Reyes's notes, Cardenas stated that she would "inform [Midwest] about replacing CUI in a week or two." *Id.* On August 1, 2006, Cardenas called Midwest and

informed them that they either needed a "plan or submit a request for a partial [waiver] for MBE" compliance. Pl. SOF ¶ 125. DPS never approved the removal of CUI as Midwest's MBE subcontractor on the contract. Def. SOF ¶ 160. CUI contends that the City should have done more to force Midwest to pay it as required under the contract. CUI is currently in arbitration with Midwest regarding the contract and the alleged shortfalls. Pl. Resp. ¶ 160.

### 5. Refusal to Grant Price Increase on Copper Tubing Contract

On December 20, 2005, CUI requested a price increase on its copper tubing contract with the City. Pl. SOF ¶ 133. CUI made three additional requests for a price increase on March 7, April 7, and May 8, 2006. *Id.* According to CUI, a price increase was necessary because copper prices were increasing due to a worldwide shortage of copper. *Id.* The City granted the initial price increase on March 30, 2006, and made the increase retroactive to November 1, 2005. *Id.* The City did not grant a second price increase. Pl. SOF ¶ 133. Under the terms of the copper tubing contract, CUI was not permitted to seek two price increases within a twelve month period. Def. SOF ¶ 195. According to the City, CUI's second price increase request was denied because, as CUI admits, the request was made within the same 12 month period as CUI's previous price increase request. *Id.* Gabriela Jaime of CUI testified that she did not recall the City ever rejecting a price increase request between 1995 to the summer of 2005. Pl. SOF ¶ 132.

On at least one occasion, CUI received an order from the City for copper tubing and did not deliver at the prices under the contract. Pl. SOF ¶ 134; Def. SOF ¶ 196. In May of 2006, without canceling CUI's copper tubing contract, the City purchased copper tubing from a

different vendor, Johnson Pipe.[12]  Pl. SOF ¶ 135.  Normally, if a contract is in place, the City cannot issue another contract for the same commodity.  *Id.*

### f.  Award of New Contracts to CUI

Between August 30, 2005, when CUI filed this lawsuit, and August 31, 2008, CUI was awarded 93 new City contracts.  Def. SOF ¶ 115.  The City has placed orders with CUI totaling in excess of $24.2 million on those new contracts.  *Id.*  Between October 20, 2005 and March 16, 2007, the City awarded to CUI 40 Target Market contracts.  Def. SOF ¶ 116.

## II.  Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Summary judgment is

---

[12] Loera testified that the City paid more for the copper tubing than it would have had it granted CUI's requested price increase.  Pl. SOF ¶ 135.  However, CUI provides no factual support for this claim. "'[S]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment.'"  *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) (quoting *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993)).

proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    Due Process Property Interest Claim (Count III)

Count III alleges that the City and Dempsey violated CUI's due process rights by *de facto* decertifying CUI between April and August of 2005. According to CUI, it has a constitutionally protected property interest in its MBE certification, of which Dempsey and the City deprived it, without due process of law, by, *inter alia*, stopping or reducing orders on existing contracts with CUI, failing to award CUI new contracts, failing to extend existing CUI contracts, and telling prime contractors that CUI was no longer certified as an MBE.

Defendants move for summary judgment on Count III on multiple grounds. First, Defendants contend that CUI has failed to establish the elements of a due process claim. Second, Defendants argue that even if CUI has established a due process claim, summary judgment nevertheless should be entered in their favor on Count III because there is no basis for holding either the City or Dempsey liable. With respect to the City, Defendants contend that CUI has failed to establish municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) for its alleged due process violation. Defendants maintain that CUI also fails to show that Dempsey had any involvement in the alleged *de facto* decertification, such that summary

judgment should be entered in her favor on Count III. Because the Court finds that CUI's due process claim fails on the merits, it need not address Defendants' other arguments.

To state a Fourteenth Amendment claim for the deprivation of a property interest without due process, a plaintiff must demonstrate that (1) he had a constitutionally protected property interest, (2) he suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law. *Moss v. Martin*, 473 F.3d 694 (7th Cir. 2007).

### 1. Protected Property Interest

CUI contends that it has a protectable property interest in its MBE certification. Under Seventh Circuit precedent, "property is what is securely and durably yours under state * * * law." *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983). To have a property interest in a government benefit – like the MBE certification at issue – "a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564 (1972); see also *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 676 (7th Cir. 1987) ("[t]he question of whether an individual has a property interest in a government benefit depends upon whether the person is entitled to that benefit"). The Seventh Circuit has held that an individual has a legitimate claim of entitlement to a government benefit "[w]here state law gives [him the] benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit." *Cornelius v. LaCroix*, 838 F.2d 207, 210 (7th Cir. 1988). For example, "[a] license to operate a business is * * * property if it cannot be taken away from the holder before the end of a definite period without proof of misconduct on his part." *Baer v. City of Wauwatosa,* 716 F.2d 1117, 1122 (7th Cir. 1983). In other words, where a license "is revocable (or nonrenewable) only for cause, it is property for purposes of determining

whether the state can deprive the licensee of it without according him due process of law." *Club Misty, Inc. v. Laski*, 208 F.3d 615, 619 (7th Cir. 2000). By contrast, where the government has unrestricted discretion to revoke a license or other government benefit, the holder has no protectable property interest in that benefit. See *Lanna Overseas Shipping, Inc. v. City of Chicago*, 1997 WL 587662, at *10 (N.D. Ill. Sept. 18, 1997). Applying these standards, the pertinent inquiry is: under what circumstances is the City permitted to revoke a vendor's MBE certification? Only if the City's discretion to decertify an MBE is constrained by certain rules or procedures can MBE certification be considered a protectable property right.

Pursuant to the Chicago Municipal Code, DPS has issued regulations governing the certification of MBEs and WBEs, which set forth procedures for decertification. The regulations provide that "[t]he City may de-certify an MBE/WBE if the Contract Compliance Administrator determines after a hearing and upon receipt of a recommendation from the [Affirmative Action Advisory] Board that any of the following are true: [lists four scenarios]." The Court reads this provision as providing an exclusive list of reasons for which an MBE may be decertified. See *City of St. Charles v. Illinois Labor Relations Bd.*, 916 N.E.2d 881, 884 (Ill. App. Ct. 2d Dist. 2009) (under the maxim of construction *inclusio unius est exclusio alterius*, "where a statute [or administrative regulation] lists the thing or things to which it refers, the inference is that all omissions are exclusions, even in the absence of limiting language"). Because the regulations constitute nondiscretionary rules governing the removal of an MBE's certification, the Court concludes that CUI has a protectable property interest in its MBE certification.

This conclusion is buttressed by the Seventh Circuit's holdings in *Baja Contractors* and *Cornelius*, which suggest that where a contractor has been certified as an MBE by the City either indefinitely or for a fixed period of time, it has a legitimate claim of entitlement to continued

certification. In *Baja Contractors*, the Seventh Circuit upheld the district court's grant of a preliminary injunction against withdrawal of the plaintiff contractor's MBE certification, concluding that the plaintiff had "established a likelihood of showing that it has a protected property interest in MBE certification because the City had already conferred that benefit upon it." 830 F.2d at 677. By contrast, in *Cornelius*, the court concluded that the plaintiff contractor did not have a protectable property interest in continued or future MBE certification where it had been certified on a contract-by-contract basis. 838 F.2d at 211-12. The *Cornelius* panel distinguished *Baja Contractors* on the grounds that, in *Baja Contractors*, the plaintiff had been granted a one year certification, whereas Cornelius had no existing certification; put differently, the City already had conferred the benefit on the plaintiff in *Baja Contractors*, but had conferred no such benefit in *Cornelius*. Here, there is no dispute that the City had granted CUI MBE certification, thereby conferring a benefit on it. Therefore, CUI has a protectable property interest in its MBE certification.

However, it should be noted that CUI's MBE certification does not give it the right to be awarded municipal contracts. Rather, MBE certification gives CUI the ability to bid for target market contracts and makes CUI an attractive subcontractor to prime contractors who are required by the City to spend a certain percentage of the contract value with MBE subcontractors. Thus, MBE certification gives CUI "increased potential for contract awards" (*Baja Contractors*, 830 F.2d at 679), not the right to receive contracts from the City. See *Kevin v. Thompson*, 235 F.3d 1026, 1027 (7th Cir. 2000) ("A license to engage in an occupation does not imply a right to be hired"). Thus, by concluding that CUI has a protectable property interest in its MBE certification, the Court does not mean to imply that CUI also has a property interest in the award of any particular municipal contract; it does not. See *Kim Constr. Co., Inc. v. Board*

*of Trustees of Village of Mundelein*, 14 F.3d 1243, 1246-47 (7th Cir. 1994) ("a disappointed bidder for a public contract lacks a property interest in the award, even if that bidder has submitted the lowest conforming bid for the project"); *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 945 (7th Cir. 2006) (noting that it is not "at all clear that there is a property right in being eligible to receive future [municipal] contracts").

### 2. Deprivation

Having determined that CUI has a protectable property interest in its MBE certification, the Court must determine whether Defendants could be found to have deprived CUI of that property right. Defendants contend that because CUI's MBE certification was not revoked, CUI cannot demonstrate that it suffered a deprivation. CUI concedes that its MBE certification never was formally revoked, but contends that it can demonstrate a deprivation by showing that the City sanctioned the effective or *de facto* revocation of its MBE certification.

The Seventh Circuit recognized in *Reed* that, under certain circumstances, an effective – albeit informal – revocation of a license can constitute a deprivation of the licensee's property rights. In *Reed*, the holders of a liquor license were harassed by village police and subjected to numerous groundless proceedings in an attempt by village officials to take away the liquor license. 704 F.2d at 947-48. Although the village's attempts to formally revoke the license failed, the continued harassment eventually caused the licensees to close their business and surrender their license. *Id.* at 947. The district court dismissed the licensees' due process claim against the village, reasoning that because the village had not actually revoked the license, there was no deprivation of plaintiffs' property. *Id.* at 948. The Seventh Circuit reversed, holding that an individual can be "deprived of their property right in [a] license even though the license was never actually revoked" if government actions "destroyed the value of the plaintiffs' licensed

business and forced them ultimately to give up their * * * license." *Id.* at 949. Borrowing from the related area of takings of property that are subject to the just compensation clause of the Fifth Amendment, the court reasoned that state officials can deprive an individual of a property right (*i.e.*, "the right of exclusive use and enjoyment") without formally revoking title to the property. *Id.* (holding that the principle that, "[i]f government makes your house uninhabitable, that is a taking of your property even if you retain a clear title[,] * * * applies equally to deprivations as distinct from takings * * * and must, or state officials could with impunity destroy property rights in detail").

Other courts of appeals similarly have held that where state actions "destroy the value or utility of a protected property interest," the state "cannot escape liability for depriving an individual of [that] property interest merely by arguing that it has not revoked or destroyed the actual legal title to that interest." *Stidham v. Peace Officer Standards And Training*, 265 F.3d 1144, 1153 (10th Cir. 2001) (holding that state official's action in disseminating damaging information about the plaintiff that prevented him from obtaining employment constituted effective revocation of plaintiff's certification to work as a peace officer); see also *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 794 F.2d 330, 336-37 (8th Cir. 1986) (holding that city officials who had forbidden builders from completing a shopping mall on land that had been zoned for the mall's construction deprived the builders of their property interest in the zoning classification, even though the zoning classification was never officially revoked, because they "destroyed the value" of the builders' zoning right). In each of those cases, the courts recognized that an effective revocation can constitute a constitutional deprivation where the government's actions render the property interest *valueless*. Other courts have concluded that, in order to show that government actions have "effectively" caused a constitutional deprivation, a plaintiff must

show that the actions "would *completely* destroy the value" of the property right. *Med Corp.,*

*Inc. v. City of Lima*, 296 F.3d 404, 413 (6th Cir. 2002) (emphasis in original) ("courts have

typically recognized indirect injuries to the value of property as constitutional 'deprivations' only

'when such indirect injuries *effectively render the property valueless*'") (emphasis in original);

*Pirolo v. City of Clearwater,* 711 F.2d 1006, 1013 (11th Cir. 1983) (rejecting due process claim

where government action, "even if done in bad faith," did not preclude plaintiff from continuing

in his profession "either at another location or under the restrictions imposed," and thus did not

have "the effect of destroying the value of [plaintiff's] business.").

Here, the evidence in the record is not sufficient to support an inference that the City's

actions rendered CUI's MBE certification valueless during the period at issue. The evidence

shows that CUI continued to serve as an MBE subcontractor on multiple contracts without issue

during the summer of 2005. Def. SOF ¶ 103. Moreover, CUI's own records show that the City

placed $939,307.61 worth of orders with CUI during the disputed period. See Pl. Apx. Vol IV,

Ex. C-7. The report of CUI's damages expert, Arnold Horwich, opines that CUI suffered a loss

of $644,457 in all of 2005. See Pl. Apx. Vol. IV, Ex. B-29, Horwich Report Feb. 29, 2008 at 1.

But even if CUI's expert is correct, the City's actions plainly did not completely destroy the

value of CUI's MBE certification.

## B.     First Amendment Retaliation Claim Against All Defendants (Count IV)

CUI claims that all Defendants retaliated against it for filing the instant suit by (1)

restricting communication between CUI and City employees, (2) failing to extend certain

contracts with CUI, (3) encouraging and/or allowing prime contractors to replace CUI as an

MBE subcontractor, (4) attempting to circumvent the award of contracts to CUI, and (5) taking

various other actions. Defendants move for summary judgment on CUI's Section 1983

retaliation claim on multiple grounds. First, Defendants contend that CUI's retaliation claim

fails on the merits because: (1) CUI's original complaint did not state a "matter of public concern," which is protected by the First Amendment; and (2) CUI cannot show that any of the alleged retaliatory acts were motivated by CUI's filing of the suit.  Second, Defendants argue that CUI has failed to establish any basis for holding any of the Defendants liable.  With respect to the City, Defendants contend that CUI has failed to establish municipal liability for the alleged First Amendment violation.  In addition, with respect to the individual defendants, Defendants argue that CUI has produced no evidence that either individual defendant was responsible for any of the alleged acts of retaliation.

The First Amendment protects independent contractors from retaliatory governmental action for the exercise of their First Amendment Rights.  *Board of County Comm'rs, Wabaunsee County v. Umbehr,* 518 U.S. 668, 685 (1996); see also *Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 424 F.3d 659, 667 (7th Cir. 2005) (recognizing "the right of independent contractors not to be retaliated against by the government on the basis of their exercise of free speech, expression, or association").  To establish a *prima facie* case of First Amendment retaliation, CUI must present evidence that: (1) it engaged in constitutionally protected speech; (2) it has suffered a deprivation likely to deter free speech; and (3) its speech was at least a motivating factor in the Defendants' actions.  *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008).

### 1. Whether CUI's Original Complaint Constituted Constitutionally Protected Speech

Courts apply the two-step analysis established in *Connick v. Myers*, 461 U.S. 138 (1983), to determine whether speech is constitutionally protected.  See *Brooks v. University of Wisconsin Bd. of Regents*, 406 F.3d 476, 479 (7th Cir. 2005) (applying *Connick* two part test in considering whether lawsuit constitutes protected speech).  The first inquiry is whether the plaintiff engaged

in speech that addressed a matter of public concern. *Id.* The Seventh Circuit has recognized that "participating in a lawsuit may amount to protected speech * * * [where] 'the lawsuit involves a matter of public concern.'" *Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 925 (7th Cir. 2007) (quoting *Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994)). To determine whether speech addresses a matter of public concern, the court examines the "content, form, and context of a statement as revealed by the whole record." *Brooks*, 406 F.3d at 479 (citing *Connick,* 461 U.S. at 147-48). Of those three elements, content is the most important factor. *Wainscott v. Henry,* 315 F.3d 844, 849 (7th Cir. 2003). Under Seventh Circuit precedent, speech is directed at a matter of public concern if it relates to any matter of "political, social, or other concern to the community," but not if it involves a personal grievance of interest only to the speaker. *Id.* (citations omitted). Second, if the plaintiff spoke on matters of public concern, the court must balance the plaintiff's interest in the expression against the government's interest in promoting effective and efficient public service. *Id.* (citing *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968)).

CUI contends that its original complaint addressed a matter of public concern because it concerned the misuse of taxpayer dollars by the City. CUI relies heavily on a statement regarding the nature of its original complaint that Judge Kennelly (the then-assigned judge on this case) made in the context of denying Defendants' motion to dismiss CUI's retaliation claim. Judge Kennelly stated that "read liberally, [the Original Complaint] alleges that the City's contracting and debarment process was manipulated by City officials, to the detriment of taxpayers" and that any injunction allowing CUI to continue doing business with the City would benefit the taxpayers, "who otherwise might be deprived of the ability to obtain goods and

services from the lowest responsible bidder." [148]. Defendants argue that CUI's complaint raised only private matters and personal grievances.

It is well established that speech protesting government waste or the misuse of public funds addresses a matter of public concern and therefore is entitled to constitutional protection. See *Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009) (letter protesting Illinois State Police's failure to solicit competitive bids on a contract, which demonstrated how wasteful that decision was, implicated a matter of public concern); *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 672 (7th Cir. 2009) (speech addressing "[g]host payrolling-paying public employees with taxpayer dollars for hours that they do not work" concerns government waste and therefore addresses a matter of public concern); *Wainscott,* 315 F.3d at 849 ("An employee's ability to highlight the misuse of public funds or breaches of public trust is a critical weapon in the fight against government corruption and inefficiency."). CUI's original complaint alleged that the City's debarment of CUI and the resulting termination of CUI's existing contracts "would threaten the public health and safety regarding the provision of essential goods." [1 at p. 6]. The complaint further alleged that CUI had been awarded the contracts the City sought to terminate because it was the lowest responsible bidder, and that the City and its citizens saved millions of dollars by obtaining goods from CUI under those contracts. *Id.* at ¶¶ 10-11. Therefore, the complaint at least implied that the issuance of a TRO would prevent the City from misusing public funds by obtaining goods from another source at higher prices.

Defendants argue that, even if the content of CUI's complaint does touch on matters of public importance, it is nevertheless a matter of private concern because it was motivated by CUI's personal interests. While courts consider the motive of the speaker as part of the "context" in which the speech was made, it is not dispositive. *Breuer v. Hart*, 909 F.2d 1035,

1038 (7th Cir. 1990); see also *Cliff v. Board of School Com'rs of City of Indianapolis, Ind.*, 42 F.3d 403, 410 (7th Cir. 1994) ("motive cannot rise to the level of an absolute litmus test because it does not supplant content in terms of overall importance to the public concern inquiry"). The Seventh Circuit has emphasized on numerous occasions that "speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests." *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 942 (7th Cir. 2004) (emphasis in original); see also *Chaklos*, 560 F.3d 705; *Valentino*, 575 F.3d at 672. Therefore, Defendants' "argument faces a high evidentiary burden." *Gazarkiewicz*, 359 F.3d at 942.

The original complaint evinces at least some concern for the well being of the taxpayers, as well as a desire to bring to light what CUI believed to be the negative consequences to taxpayers of the City's actions. Thus, there is a genuine issue of material fact as to whether CUI was motivated solely by its own concerns. See *Gustafson v. Jones*, 290 F.3d 895, 908 (7th Cir. 2002) (holding that plaintiffs' retaliation claim survived "even if [plaintiffs] were advancing some private interests * * * as long as they also intended to bring to light what they believed to be the negative law enforcement consequences of the new policy"). The Court therefore concludes that CUI has offered enough evidence to survive summary judgment on the issue of whether its complaint addressed a matter of public concern. Given that Defendants do not address the *Pickering* balancing test, or argue that the City's interest in promoting effective and efficient public service outweigh the public concern CUI raised, CUI adequately has shown that it engaged in constitutionally protected speech. See *Valentino*, 575 F.3d at 672.

## 2. Motivating Factor

CUI must establish a causal link between its protected expression and Defendants' subsequent actions by showing that the filing of this suit was a substantial or motivating factor in

Defendants' actions. *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006). A motivating factor does not amount to a but-for factor or the only factor, but rather is a factor that motivated the defendant's actions. *Id.* "Circumstantial proof, such as the timing of events or the disparate treatment of similar individuals, may be sufficient to establish the defendant's retaliatory motive." *Id.* However, "suspicious timing alone is generally insufficient to establish a genuine issue of material fact" as to the defendant's motive. See *Valentino*, 575 F.3d at 673.[13] If CUI demonstrates that an improper purpose was a motivating factor in Defendants' actions, the burden shifts to Defendants to show that the same decision would have been made in the absence of the protected speech. *George*, 535 F.3d at 538. If Defendants carry that burden, CUI must then demonstrate that Defendants' proffered reasons were pretextual and that retaliatory animus was the real reason for the decisions. *Id.* "In the summary judgment context, this means that, to rebut the defendants' proffered explanations for their [actions], [CUI] must produce evidence upon which a rational finder of fact could infer that these explanations were lies." *Massey*, 457 F.3d at 717. Applying these standards, the Court will address whether CUI has shown that any of the allegedly retaliatory actions were motivated by CUI's lawsuit against Defendants.

### a.      Failure to Extend Contracts

In support of its argument that the City's decision not to extend eight of CUI's contracts was motivated by the lawsuit, CUI points to the timing of those decisions (*i.e.*, that they occurred

---

[13] CUI relies on *Shefcik v. Village of Calumet Park*, 532 F. Supp. 2d 965 (N.D. Ill. 2007) for its claim that evidence of a "continuous stream of retaliatory action" coupled with suspicious timing is sufficient to state a *prima facie* First Amendment retaliation claim. But the plaintiff in *Shefcik*, who alleged that he was fired for filing union grievances, did not rely solely on suspicious timing to establish improper motive. Rather, Shefcik produced evidence that an individual involved in making the decision to terminate Shefcik's employment stated that the grievances were "petty and childish." *Id.* at 979. The court expressly relied on this evidence in concluding that the plaintiff had raised a genuine issue of material fact as to whether his union grievances were a substantial or motivating factor behind his firing. *Id.*

some time after the suit was filed) and the City's practice – prior to April of 2005 – of regularly extending contracts.[14] The Supreme Court has held that to make the required initial showing that the nonrenewal of a government contract was motivated by protected speech, a plaintiff must prove more than the mere fact that it engaged in protected speech before the defendant elected not to renew contract. *Umbehr*, 518 U.S. at 685. But that is all CUI shows here. And even if timing alone could give rise to an inference of improper motive – it cannot – here, that inference would be undermined by the fact that the City did extend at least 14 of CUI's contracts after the filing of the suit. Moreover, CUI's contention that the non-renewal decisions were motivated by the filing of this lawsuit is further undermined by the fact that the City also failed to extend a number of CUI's contracts in the months preceding the filing of the suit.

### b. Short Courtesy Certifications

Similarly, CUI has failed to establish a causal link between the filing of the lawsuit and the issuance of short certification letters. The evidence shows that all MBEs were required to reapply for certification, and that they all received short courtesy extensions while their reapplications were pending. If CUI could show that all other MBEs received longer certification letters that it did, that evidence of disparate treatment, combined with the timing, might be sufficient to establish the City's retaliatory motive. See *Massey*, 457 F.3d at 717 (disparate treatment of similar individuals may provide circumstantial evidence of retaliatory motive). But the evidence also shows that while some MBEs received longer courtesy certifications than did CUI, others received shorter ones. Therefore, CUI has failed to present

---

[14] CUI also claims there was "no justifiable reason not to extend the contracts when to do so would have been in the public interest." However, CUI has produced no evidence that neither the City's needs for the goods at issue nor the available funding had changed. Therefore, there is no basis to infer that the City had no reason to extend the contracts. And the City is not required to provide an explanation for decision not to extend unless CUI first has made out a *prima facie* case, which it has not. See *George*, 535 F.3d at 539.

enough circumstantial evidence upon which a jury could conclude that this lawsuit in any way motivated the City to issue CUI short certification letters.

### c. Refusal to Grant Price Increase on Copper Tubing Contract

CUI contends that in the spring of 2006 the City retaliated against it with respect to CUI's copper tubing contract by refusing to grant CUI a second price increase and by obtaining copper tubing from another source without first terminating its contract with CUI. As support for this contention, CUI relies on the following: Gabriela Jaime's testimony that the City generally granted CUI's price increase requests, the fact that the City did not properly cancel CUI's contract before obtaining copper tubing from another source, and a newspaper report that the City granted a price increase on an unrelated contract for de-icing materials in 2008.

The fact that the City apparently agreed to a three-fold price increase on a separate contract with unnamed vendors for another commodity two years after the incident at issue is wholly irrelevant, and does not give rise to an inference of improper motive. While the Seventh Circuit has stated that the "disparate treatment of similar individuals" may provide circumstantial evidence of retaliatory motive, *Massey*, 457 F.3d at 717, CUI has provided no evidence suggesting any similarities between the copper tubing incident and the de-icing incident. For example, there is no evidence that the vendor on the de-icing contract – like CUI – requested a price increase that it was prohibited from seeking under the express terms of the contract.

The remaining evidence indicates that the City deviated from its usual practices in order to obtain the copper tubing from a vendor other than CUI. Even if this evidence is sufficient to support an inference of improper motive, the City carried its burden of showing that it would have taken the same actions even if CUI never filed the lawsuit. With respect to the City's denial of CUI's price increase request, the City contends that the request was denied because, as CUI concedes, the terms of the copper tubing contract prohibited CUI from obtaining two price

increases within a twelve month period, and the request at issue was made within twelve months of another price increase request. CUI has produced no evidence upon which a rational finder of fact could infer that this legitimate explanation for the denial of the price request increase is a lie, as it must to survive summary judgment. *Massey*, 457 F.3d at 717.

The City also explains its decision to obtain the copper tubing from another vendor. CUI concedes that, on at least one occasion, it failed to deliver copper tubing to the City at the contract price. The City contends that it obtained the copper tubing from another source because CUI had failed to satisfy its contractual obligations. As the Supreme Court recognized in *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 724-25 (1996), in the context of awarding government contracts, governmental entities have a legitimate interest in dealing with reliable persons and ensuring the uninterrupted supply of goods and services. In light of CUI's failure to deliver under the terms of the copper tubing contract, both of these legitimate interests would be served by obtaining the copper tubing from a source other than CUI. CUI has not presented evidence to rebut the City's explanation. CUI contends that the City paid more for the copper tubing than it would have had it granted CUI's requested price increase, but provides no factual support for that contention. But even assuming the City did pay a higher price to obtain the tubing from another source, that does not undermine the City's asserted justification. As noted above, the City has a legitimate interest in dealing with reliable contracting parties that will not refuse to meet their contractual obligations; it is not unreasonable to believe that the City would be willing to pay a premium for such reliability.

### d.       Removal of CUI's Motor Oil Certification

CUI also has failed to show that the City's refusal to allow CUI to act as an MBE on either its motor oil contract with the City or the NAPA contract was motivated by the filing of

this suit. CUI does not dispute that the City made the decision to remove CUI's certification in the area of motor fuel and automotive supplies on October 26, 2004 – more than ten months before CUI filed this suit. CUI does not challenge that determination in this suit. With respect to CUI's motor oil contract with the City, the evidence shows that when the City awarded CUI the contract in the fall of 2005, the City – consistent with the October 2004 determination – informed CUI that it could not serve as its own MBE on the contract. CUI provides no evidence giving rise to a *prima facie* inference of improper motive in regard to that contract.

With respect to the NAPA contract, CUI contends that the City enforced its decision regarding CUI's certification in the area of automotive supplies and motor fuels in retaliation for CUI's protected speech. In support of that contention, CUI points solely to the timing of the City's enforcement decision (*i.e.*, that the City allowed NAPA to receive MBE credit for using CUI as an MBE subcontractor for nearly two years after the removal of motor fuel and automotive supplies from CUI's certification, and only told NAPA it could no longer receive such credit after this suit was filed). While in some cases "[a] plaintiff may demonstrate improper motive with evidence that the adverse decision 'took place on the heels of protected activity,' * * * 'the fact that a plaintiff's protected speech may precede an adverse * * * decision alone does not establish causation.'" *George*, 535 F.3d at 539. Moreover, "[t]he inference that protected speech was the motive for an adverse employment decision weakens as the time between the protected expression and the adverse action increases, and additional proof of a nexus is required." *Id.* Here, the City did not inform NAPA that it could no longer receive MBE credit for using CUI as an MBE subcontractor to supply motor oil until September 2006, more than a year after the law suit was filed. The year long interval between the filing of the complaint and the City's action is too long to raise an inference of a causal connection between

the two.  See *Samuelson v. LaPorte Community School Corp.,* 526 F.3d 1046, 1054 (7th Cir. 2008) ("standing alone, the timing of [plaintiff's protected speech] cannot suffice to demonstrate that the Board was motivated by those incidents because they occurred more than a year before the Board's decision"); *Richter v. Village of Oak Brook*, 2003 WL 22169763 (N.D. Ill. Sept. 19, 2003) (in First Amendment retaliation case, year long lapse between protected speech and adverse action "is too long to establish a causal link in the absence of any substantive evidence"); *Patterson v. County of Cook*, 2004 WL 1497786, at *16 (N.D. Ill. June 30, 2004) ("Absent other suspicious circumstances, a gap of eight months is too long to suggest any connection between" the filing of grievance and adverse action).

In any event, even if CUI could raise an inference of retaliatory motive, it fails to demonstrate that the City's stated, non-retaliatory reasons for refusing to allow NAPA to get MBE credit for using CUI as a subcontractor were a pretext for its true motivations.  As noted above, it is undisputed that more than ten months before CUI filed this suit the City made the decision to remove CUI's certification in the area of motor fuel and automotive supplies.  The propriety of that determination is not at issue in this suit.  The City contends that the decertification determination was the basis for its actions with respect to the NAPA contract. Moreover, the City explains that it allowed NAPA to receive MBE credit for nearly two years after the removal of motor fuel and automotive supplies from CUI's certification because the September 2006 contract renewal was the first opportunity it had to assess CUI's compliance with respect to that contract.  CUI has presented no evidence tending to show that those explanations are not true.

### e.  Reluctance to Award Contracts to CUI

CUI contends that the City manipulated the award of three contracts – the library shelving contract, the library racks contract, and the recycling carts contract – in an effort to avoid awarding them to CUI in retaliation for CUI's suit against the City. CUI fails to demonstrate a triable issue of fact as to whether retaliation was a motivating factor in the City's handling of any of these contracts.

In August 2006, the City awarded the library shelving contract to the lowest bidder, despite the fact that it did not have MBE or WBE certification at the time. CUI contends that the City improperly awarded the contract to the uncertified vendor in order to avoid awarding it to CUI. But the evidence shows that CUI was not the second lowest bidder, and thus would not have been awarded the contract even if the City had not improperly awarded it to an uncertified vendor. Therefore, no reasonable finder of fact could conclude that the City manipulated the award of the library shelving contract in retaliation against CUI.

In an effort to demonstrate a retaliatory motive, CUI contends that Dempsey, who became commissioner of the Chicago Public Library in September 2005, played a role in the award of the library shelving contract. In support of this claim, CUI points to a June 26, 2007 e-mail from Chicago Public Library Director of Procurement Maria Ligammari to Olivia Boyd and Brandie Knazze, requesting, on behalf of "the Commissioner," information about bidding for the library shelving contract, including who bid and their bids. But, if anything, this e-mail tends to refute CUI's conjecture regarding Dempsey's involvement; if Dempsey had been involved in the award of the library shelving contract, she would have had no reason to inquire about the details of the bidding process a year after the contract was awarded.

With respect to the library racks contract, CUI contends that the City retaliated against it by rejecting its first bid in December 2006. CUI speculates that the City merely was attempting to avoid awarding the contract to CUI. As with the library shelving contract, CUI seeks to link Dempsey to the library racks contract, in an effort to create an inference of retaliatory motive. To that end, CUI points to an e-mail from a library employee stating that "Procurement Services has decided to award this bid to the sole bidder after much consideration." Pl. Resp. ¶ 136. The Court is at a loss to see how this e-mail creates an inference of improper motive. As an initial matter, it is not clear from the e-mail that "Procurement Services" refers to the Chicago Public Library's Procurement Services Department, as CUI contends, and not DPS. Even assuming that CUI is correct, the e-mail merely shows that the Chicago Public Library's Procurement Services Department played a role in the award of the library racks contract. CUI has presented no evidence regarding the relationship between the library commissioner – Dempsey – and the Library's Procurement Services Department. Therefore, the e-mail does not give rise to an inference that Dempsey was involved in the award of the contract. And even if it did, the fact that Dempsey participated in the decision to award the contract to CUI after "much consideration" would hardly demonstrate improper motive.

CUI points to no other evidence showing that its protected speech was a motivating factor in the City's decision to reject its first bid on the library racks contract, and "mere speculation or conjecture will not defeat a summary judgment motion." *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 544 F.3d 752, 757 (7th Cir. 2008) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)). CUI complains that the City had no valid reason for not awarding the contract to CUI on the first bid, but the City is under no obligation "to prove a legitimate reason for [its action] until [CUI] has come forth with sufficient evidence to support

a *prima facie* case of" First Amendment retaliation. *Garrett v. Barnes*, 961 F.2d 629, 633 (7th Cir. 1992); see also *George*, 535 F.3d at 539 (defendants are not required to provide a "good explanation" for their actions unless plaintiff first makes out a *prima facie* case of retaliation).

With respect to the recycling carts contract, CUI contends that the City initially sought to bid the contract as a sole source contract and only permitted manufacturers to submit bids in an effort to prevent CUI from obtaining the contract. Even assuming that the City did manipulate the bidding process to prevent CUI from bidding, as CUI contends, CUI has not shown that the City did so in retaliation for the filing of this lawsuit. See *George*, 535 F.3d at 539 (7th Cir. 2008) (unexplained delay in filling position for which plaintiff applied "no more proves the defendants were motivated by political bias than that they were motivated by gender bias or some other kind of bias"). As noted above, neither the fact that CUI's protected speech preceded the City's action, nor CUI's speculation, is sufficient to create a genuine issue of fact at to whether the City had a retaliatory motive. Moreover, CUI's contention that the City sought to avoid awarding the recycling contract to CUI is undermined by two facts. First, the City expressly told Zarn, a recycling carts manufacturer, that if it obtained the contract it could use CUI as its MBE. Second, the City ultimately awarded the contract to CUI.

### f.      Cardenas Incidents

CUI contends that two incidents involving DPS's Monica Cardenas – one concerning Standard Equipment Company and one concerning Midwest Service Center – constituted retaliation. With respect to Standard Equipment Company, CUI contends that in November of 2006 Cardenas retaliated against it by telling Standard Equipment Company executives that the City would look favorably upon an application by Standard Equipment Company to replace CUI as its MBE subcontractor. CUI presents no evidence linking this incident to the filing of this

lawsuit. Rather, CUI asks this Court to speculate that Cardenas harbored an improper motive, stating "could there be any motive for this activity other than to retaliate against and punish CUI?" [300 at 86]. But, as noted above, CUI cannot survive summary judgment based on mere speculation and conjecture. *Rockwell Automation, Inc.*, 544 F.3d at 757. Rather, CUI must produce evidence tending to show a causal connection between its speech and the City's action. Here, "[a]t most, [CUI] has shown that [Cardenas] did not want to [to work with it], but [it] has not provided evidence telling us why, and has produced literally no evidence of an improper reason." *George*, 535 F.3d at 539.

With respect to Midwest, CUI contends that the City did not do enough to force Midwest to meet its MBE commitments to CUI, and that the City should have canceled its contracts with Midwest. As with the Standard Equipment incident, CUI provides no evidence tending to show a causal connection between the City's actions and the filing of this lawsuit.

g.      **Emergency Purchase of Signs**

CUI contends that in March 2006 the City and Defendant Langone retaliated against it by manipulating the purchase of aluminum sign blanks and pre-made signs so as to avoid purchasing the goods from CUI. According to CUI, Defendants avoided awarding these contracts to CUI by purchasing the aluminum sign blanks and pre-made signs on an emergency basis (as opposed to putting out a competitive bid), so that it could solicit quotes from the only vendors of their choice, which did not include CUI. CUI presents enough circumstantial evidence upon which a jury could conclude that Defendants' actions with respect to the emergency purchase of signs were motivated, at least in part, by the lawsuit. First, CUI points to evidence that the City improperly split up the order of pre-made signs into three orders so as to avoid the $250,000 cap on emergency purchases. As noted above, purchasing the signs on an

emergency basis allowed the CDOT to solicit quotes from the vendors of its choice, and thus to exclude disfavored vendors. In addition, viewing the facts in the light most favorable to CUI, the record would allow the rational inference that Langone – one of the defendants named in CUI's original complaint – played a significant role in the decision not to solicit a quote from CUI.

However, Defendants have met their burden of demonstrating that they would have made the same decision in the absence of the protected speech. Langone testified that CDOT decided not to solicit CUI for quotes on the March 2006 emergency contracts because of CUI's "past performance and delivery." Def. SOF ¶ 187. The record shows that CDOT had experienced delivery problems with CUI on its aluminum sign blanks contract. According to an August 17, 2005 letter from Cheri Heramb to Dempsey, CUI had a history of making late deliveries on the aluminum sign blanks contract, sometimes taking anywhere from 248 days to 399 days to deliver sign blanks; the contract required CUI to deliver the sign blanks within 14 hours of receiving an order. Moreover, the basis for CUI's proposed debarment was an accusation by Langone and the CDOT that CUI had submitted a false shipping ticket to the City in connection with the aluminum sign blanks contract. CUI has presented no evidence tending to show that the City and Langone are lying about their reasons for not soliciting bids from CUI on the emergency contracts.

### h. Restriction on Communications

Defendants concede for purposes of this motion that the imposition of the communication restriction was prompted by the filing of this suit. Because there is a causal link between CUI's speech and the communication restriction, the burden shifts to Defendants to show that the same decision would have been made in the absence of CUI's protected speech. The City explains that the restriction was not motivated by a desire to retaliate against or punish CUI, but was a

matter of prudence in light of the fact that it had been sued by CUI. The evidence indicates that the decision to impose the restriction also was motivated by a desire to prevent CUI's persistent inquiries from distracting DPS employees from their other work, as well as to ensure that CUI received consistent information. Each of these stated reasons is legitimate, and therefore the burden shifts back to CUI to show that a reasonable jury could conclude that Defendants' justifications are pretextual – meaning that they are lies.

CUI points to the testimony of DPS employees and CUI's owners that, at times, the communication restriction was frustrating and made it difficult to get work done. However, "[t]he focus of a pretext inquiry is whether the [defendant's] stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson,* 207 F.3d 374, 378 (7th Cir. 2000). In the context of employment cases, the Seventh Circuit has noted that "[t]he judiciary is not a super-personnel department that reexamines and reinvestigates employee disputes courts." *Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1035 (7th Cir. 1999). Similarly, here, this Court's function is not to second guess the efficacy of the City's decision. Because CUI has failed to show that Defendants' stated reasons for the communication restriction were so unreasonable as to create the inference that Defendants did not subjectively believe in those reasons, there are no genuine issues of material fact regarding Defendants' motive for funneling CUI's communications through a single employee.

### i.    Sum of Allegedly Retaliatory Actions

The Court recognizes that, under certain circumstances, evidence of a pattern of adverse actions combined with suspicious timing may establish the requisite causal link to establish a *prima facie* case of retaliation. See *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (plaintiff may establish the requisite causal connection between protected speech

and adverse action by proving "a pattern of antagonism coupled with timing"). However, here, the record as a whole does not support an inference that the City has been waging a campaign of retaliation against CUI. The evidence shows that in the three years after CUI filed suit against the City, the City awarded CUI 93 new contracts, on which the City has placed orders totaling in excess of $24.2 million. The record also demonstrates that the City has extended 14 contracts with CUI since the filing of the lawsuit.

Because CUI has failed to establish that its protected speech played a substantial role in any of Defendants' adverse actions, Defendants' motion for summary judgment is granted as to all Defendants on CUI's First Amendment retaliation claim.

### C.    Breach of Contract Against the City (Count VI)[15]

CUI alleges that, between March and August of 2005, the City breached a number of its existing contracts with CUI by (1) stopping or reducing orders on contracts, (2) refusing to extend contracts, and (3) failing to communicate with CUI. The Court will address each of these claims in turn.

---

[15] Because the Court has granted summary judgment as to all claims over which it has original jurisdiction (28 U.S.C. § 1367(c)(3)), the Court must address whether to retain jurisdiction over CUI's state law contract claim. As the Seventh Circuit consistently has stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501 (7th Cir.1999); *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additivies Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). However, in *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251-53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point to a federal decision of the state-law claims on the merits." This is one of those unusual cases in which departure from the usual practice is appropriate. This case has been pending in federal court for more than four years, and this Court has devoted substantial judicial resources to learning the voluminous record in this case. Moreover, familiarity with the contracts was necessary to resolve the federal claims. Finally, no party has suggested that the Court should not decide CUI's contract claim. In sum, considerations of judicial economy, convenience, and fairness to the parties all counsel in favor of resolving the merits of Count VI at this time.

## 1.     Stopping or Reducing Orders on Existing Contracts

CUI first contends that the City breached various contracts by significantly reducing the volume it ordered on those contracts, in some cases to zero.[16]  It is undisputed that all of the contracts at issue are Depends Upon Requirement ("DUR") contracts, meaning that, under the terms of the contracts, the City was authorized to increase or decrease the quantity of goods it ordered based on its needs.[17]  See Pl. Resp. ¶ 208-10.  In other words, as the parties agree, the contracts are requirements contracts.

Under Illinois law, "a buyer [in a requirements contract] may not terminate its requirements in bad faith."  *Schawk, Inc. v. Donruss Trading Cards, Inc.*, 319 Ill.App.3d 640, 645, 746 N.E.2d 18, 23 (Ill. App. Ct. 1st Dist. 2001); see also 810 ILCS 5/2-306 ("[a] term which measures the quantity by the * * * the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded").  Illinois courts have

---

[16] Although the basis for this breach of contract claim is not entirely clear, it appears from CUI's response brief that it is claiming that the City breached all of the 49 active contracts it had with CUI between April and August of 2005.  CUI argues that the City breached 26 of those contracts by placing no orders on them, and that the City breached the remaining 23 contracts by reducing its orders.  With respect to the 23 contracts on which the City did place some orders, CUI focuses on the fact that the total number of orders the City placed on all 49 contracts fell.  However, in order to demonstrate that the City breached each of those 23 contracts, it must present evidence that the City improperly reduced it orders on each individual contract.  CUI's own records indicate that on one contract (for the Ornamental Poles & Luminaires Contract) the City's orders actually increased during the disputed period. Pl. Apx. Vol. IV, Ex. C-7.  Moreover, while CUI presented evidence of the amount the City ordered on each contract for the entire life of the contract prior to April 2005, and for the disputed period, it does not indicate how much the City should have been expected to order during the disputed five month period.  *Id.*  Therefore, there is no basis for determining whether the City's orders on each contract fell significantly or not.

[17] Each contract contains a "Quantities" provision.  Pl. Resp. ¶ 209.  Although some variation exists in the wording of the quantities provisions, the following language is typical: "Any quantities shown on the Proposal Page are estimated only for bid canvassing purposes. The City reserves the right to increase or decrease quantities ordered under this contract. Nothing herein shall be construed as an intent on the part of the City to purchase any Video Cameras and Accessories other than those determined by the Using Department to be necessary to meet their current needs." *Id.* ¶ 210.

explained that where "a buyer has a legitimate business reason for eliminating its requirements business, rather than a desire to avoid its contract, it acts in good faith." *Schawk*, 746 N.E.2d at 25. To determine whether a buyer that has reduced or eliminated its requirements acted in good faith, courts ask whether the buyer had a legitimate business reason for doing so or whether it merely had second thoughts about the terms of the contract and a desire to get out of it. *Id.*

CUI bears the burden of proving that the City acted in bad faith in reducing its requirements. See *Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333, 1341 (7th Cir. 1988) (applying Illinois version of U.C.C. § 2–306(1)). Therefore, in order to survive summary judgment, CUI must present specific facts showing a genuine issue of fact exists as to whether the City acted in bad faith. *Celotex*, 477 U.S. at 323.; see also *Hanley v. Trendway Corp.*, 953 F.Supp. 232, 236 (N.D. Ill. 1996) ("in order to survive a motion for summary judgment, a plaintiff must present some evidence to support an allegation of bad faith").

In an effort to show bad faith, CUI relies on the fact that the City ordered less in the summer of 2005 than it did in the summer of 2004.[18] But this is true in every case in which a buyer in a requirements contract reduces or eliminates its requirements; the reduction itself is not evidence of bad faith. And CUI's speculation that the City must have needed the goods at issue in 2005 if it needed them in 2004 is not sufficient to avoid summary judgment. See *Zeidler v. A & W Restaurants, Inc.*, 301 F.3d 572, 575 (7th Cir. 2002) (plaintiffs' "unsupported assertions" that defendants acted in bad faith in canceling contract "are not evidence sufficient to defeat a motion for summary judgment"). CUI also contends that the City needed the commodities at

---

[18] CUI also notes that each DUR contract sets forth the City's estimated requirements, which is supposed to be good faith estimate of the City's anticipated need for the goods. The implication appears to be that the City did not meet those estimates, but CUI has not presented any evidence to that effect. But even assuming the City did deviate significantly from the estimates, CUI must present evidence of bad faith in order to avoid summary judgment. See *Empire Gas Corp.*, 840 F.2d at 1341 (seller bears burden of proving buyer acted in bad faith in reducing estimated requirements).

issue and ordered them from other vendors. In support, CUI points to the City's emergency purchases of sewer brick and tapping sleeves and valves. But CUI did not have a contract with the City for those commodities during the disputed period; therefore these incidents are irrelevant to CUI's breach of contract claim. CUI provides no evidence that the City needed the goods for which CUI actually held contracts during the time period at issue. Because CUI has failed to present any evidence of bad faith, its breach of contract claim based on the City's reduction in orders cannot survive summary judgment.

### 2. Refusing to Extend Contracts

CUI also contends that the City breached its contractual obligations by failing to grant extensions on eight contracts.[19] According to CUI, for the 20 years that it did business with the City prior to March 2005, the City always exercised its right to extend contracts. CUI contends that this course of dealing between the parties obligates the City to extend contracts where it still needs the goods and CUI is able to supply those goods at the stated contract price.

Under Illinois law, a course of dealing between contracting parties is admissible "to explain or supplement the terms of an agreement even without a determination that the agreement is ambiguous." *K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 359 Ill. App. 3d 1137, 1144 (4th Dist. 2005); see also 810 ILCS 5/2-202(a) (written contract terms may be explained or supplemented by course of performance, course of dealing, or usage of trade"). However, a course of dealing may not be used to contradict the express terms of a written contract. See *Midwest Builder Distributing, Inc. v. Lord and Essex, Inc*., 383 Ill. App. 3d 645, 673 (1st Dist. 2007); *Scott v. Assurance Co. of America*, 253 Ill. App. 3d 813, 818 (4th Dist. 1993); *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc*., 212 F.3d

---

[19] CUI concedes that this breach of contract claim is based solely on contracts that the City did not extend between April and August 2005. Pl. Resp. ¶ 204. By the Court's count, during that time period, the City refused to extend 6 contracts, and reneged on its agreement to extend the sewer brick contract.

373, 380 (7th Cir. 2000) ("the Illinois Commercial Code only allows extrinsic evidence including course of performance, course of dealing, and usage of trade to be considered when it is reasonably consistent with the express terms of the contract"). Consequently, "if the express terms of the contract and the course of performance cannot be reconciled, express terms will trump course of performance." *Midwest*, 891 N.E.2d at 27.

With the exception of three contracts, which are discussed below, all of the contracts at issue contain contract extension clauses. Def. SOF ¶ 229. A typical contract extension provision states: "The Chief Procurement Officer may elect to extend this contract for an additional two (2) one (1) year periods from the expiration of this contract under the same terms and conditions of the original contract." *Id.* Because the express terms of the contracts allow the City, at its *discretion*, to extend, implying a term *requiring* the City to extend contracts where it still needs the goods and CUI is able to supply those goods at the stated contract price – as CUI requests – would contradict the express terms of the contract extension clauses. Under the case law cited above, the Court may not go outside the terms of the contracts.

As noted above, three contracts to not contain a discretionary extension provision like the one quoted above. The Laser Speed Detectors contract contains no provision permitting a contract extension. Def. SOF ¶ 229. Even if the Court were to imply a term requiring the City to extend the contract, CUI's breach of contract claim cannot survive summary judgment with respect to the laser speed detectors contract because CUI has presented no evidence that the City still needed laser speed detectors when the contract lapsed. Two other contracts – for steel trash receptacles and ballast housing – contain an extension provision requiring the Chief Procurement Officer to "exercise the City's unilateral right to renew this Contract following the expiration of the base contract term * * * subject to acceptable performance by the Contractor and contingent

53

upon the appropriation of sufficient funds for the purchase of the goods provided for in this Contract." Pl. Resp. ¶ 229; Pl. Apx. Vol. IX, Ex. I-62 at 6-6; Pl. Apx. Vol. IX, Ex. I-63 at 28-5 (emphasis added). But CUI has failed to introduce evidence that it performed in an acceptable manner on those contracts, or that sufficient funds were appropriated for the purchase of the goods at issue. Therefore, it has failed to show that the City was obligated to extend those contracts. Moreover, the steel trash receptacles and ballast housing contracts expired in November 2006 and October 2005 respectively, and therefore, by CUI's own admission, are not at issue in this lawsuit.

### 3. Failure to Communicate with CUI

Finally, CUI contends that the City's lack of communication with CUI between April and August 2005 constitutes a breach of contract. CUI bases this claim on the testimony of DPS employees that it was their responsibility to assist vendors in the administration of contracts. But CUI does not even attempt to tie this claim to the language of the contracts. The Court is aware of no implied requirement under Illinois law that contracting parties communicate with one another, and CUI points to no other basis for this claim.

### D. Claim for Injunctive Relief (Count VI)

Having granted summary judgment in favor of Defendants on CUI's substantive claims, there is no basis for awarding CUI injunctive relief. Therefore, Defendants' motion for summary judgment is granted as to Count V.

## IV.     Conclusion

For the foregoing reasons, Defendants' motion for summary judgment [269] is granted and Defendants Dempsey and Langone's motion for summary judgment based on qualified immunity [274] is denied as moot.

Dated: January 15, 2010                    _____

                                           Robert M. Dow, Jr.
                                           United States District Judge