## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHICAGO UNITED INDUSTRIES, LTD., )
an Illinois corporation, GEORGE LOERA, )
and NICK MASSARELLA, )
                                         )
           Plaintiffs, )
                                           )
          v.                                )      Case No.:  05-cv-5011
                                           )
CITY OF CHICAGO,                         )      Judge Robert M. Dow, Jr.
MARY DEMPSEY, and                  )
LOUIS LANGONE,                    )
                                           )
         Defendants.                  )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Chicago United Industries, Ltd.'s ("CUI")

motion to reconsider [323] the Court's Memorandum Opinion and Order [318] dated January 15,

2010, which granted Defendants' motion for summary judgment [269] and denied as moot

Defendants Dempsey and Langone's motion for summary judgment based on qualified immunity

[274].[1] For the following reasons, CUI's motion to reconsider [329] is denied.

---

[1] Also before the Court is Plaintiffs' motion for leave to supplement its Joint Appendix [326] with an excerpt from the Sewer Brick contract. CUI contends that the City's refusal to extend the sewer brick contract is an example of the *de facto* decertification that CUI alleges occurred during the Spring and Summer of 2005. In its motion for summary judgment, the City argued that it refused to extend the contract because CUI refused to deliver sewer bricks while a modification of the sewer brick contract was pending. Def. SOF ¶ 51. According to CUI, the excerpt at issue demonstrates that the City's proffered reason is untrue. The excerpt states that the City is not required to pay CUI for any items delivered without a properly executed contract modification. CUI's motion to supplement is not well-taken. A Rule 59(e) motion "'does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment.'" *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000) (quoting *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996)). CUI admits that the excerpt at issue is not newly discovered, and that nothing prevented CUI from presenting the evidence during the pendency of the summary judgment motions. Moreover, contrary to CUI's claim, the Court did not credit the City's contention regarding why it refused to extend the contract. Rather, in ruling on CUI's due process claim, the Court found that CUI had failed to demonstrate that Defendants' actions – regardless of Defendants' motivations – had destroyed the value

## I. Background

This case involves a now long-standing dispute between the City of Chicago and CUI, a City contractor. The relevant facts are set forth in detail in the Court's January 15, 2010 Memorandum Opinion and Order ("the Opinion"), and will not be restated in their entirety here. In brief, the dispute dates back to March 17, 2005, when the City issued a Preliminary Notice of Intent to Decertify CUI as a minority-owned business enterprise ("MBE") based on the allegation that CUI was operating as a broker. Shortly thereafter, on March 31, 2005, the City issued a notice of intent to debar CUI from doing business with the City based on the allegation that CUI had submitted a false shipping ticket in connection with a delivery of aluminum sign blanks (unpainted traffic signs) to the City's Department of Transportation ("CDOT"). CUI contends that, since that time, the City essentially has systematically mistreated CUI (by, among other things, stopping or reducing orders on existing contracts with CUI, failing to award CUI new contracts when it was the lowest bidder, failing to extend existing CUI contracts, and refusing to communicate with CUI) in an effort to drive CUI out of business.

On August 24, 2005, the City debarred CUI and its owners from doing business with the City and terminated its existing contracts with CUI. CUI then filed this suit, seeking injunctive relief on the ground that the City had violated the due process clause of the Fourteenth Amendment by failing to give CUI a predeprivation hearing. Judge Shadur, the district court judge assigned to the case at that time, issued a temporary restraining order on August 31, 2005 enjoining the Defendants from enforcing the debarment and from canceling any of CUI's existing contracts with the City. Shortly thereafter, the City reinstated CUI's contracts with the City and rescinded the debarment order. However, according to CUI, the pattern of mistreatment

---

of CUI's MBE certification. That ruling did not turn on whether Defendants took the various complained-of actions in good faith. For those reasons, CUI's motion for leave to supplement its Joint Appendix [326] is denied.

(again including stopping or reducing orders on existing contracts with CUI, failing to award CUI new contracts when it was the lowest bidder, failing to extend contracts with CUI, and restricting communications with CUI) did not stop.

CUI characterizes the alleged mistreatment that occurred between April and August of 2005 as an effort by the City to deprive it of its MBE certification (*i.e.*, *de facto* decertification) in violation of CUI's due process rights. CUI characterizes the mistreatment that allegedly has continued since the August 2005 as retaliation in violation of the First Amendment for the filing of this suit.

The Opinion, which CUI asks the Court to reconsider, addressed Counts III, IV, V, and VI of CUI's six-count Third Amended Complaint. With respect to Count III, a procedural due process property interest claim against the City and Dempsey, the Court concluded that CUI has a constitutionally protected property interest in its MBE certification. However, the Court nevertheless granted summary judgment in favor of Defendants on Count III, finding that CUI failed to present sufficient evidence from which a reasonable jury could conclude that CUI had suffered a loss of that interest amounting to a constitutional deprivation. The Court granted summary judgment in favor of Defendants on Count IV, in which CUI alleged that Defendants retaliated against it for filing the instant lawsuit in violation of the First Amendment, on the ground that CUI had failed to establish a genuine issue of material fact as to causation (*i.e.*, whether its protected speech caused Defendants' adverse actions). In Count VI, CUI alleged that the City breached a number of its contracts with CUI by (1) stopping or reducing orders on contracts, (2) refusing to extend contracts despite regularly doing so in the past, and (3) failing to communicate with CUI. The Court concluded that Count VI could not survive summary judgment because: (1) CUI presented no evidence from which a reasonable jury could conclude

that the City reduced or terminated its requirements in bad faith; (2) the parties' course of dealing with respect to extensions could not be used to imply a term requiring the City to extend its contracts because such a term would contradict the express terms of the contracts; and (3) the contracts did not require that the City maintain any particular level of communication with CUI. Finally, the Court granted summary judgment in favor of Defendants on Count V, concluding that there was no basis for awarding CUI injunctive relief because none of CUI's substantive claims had survived summary judgment.

## II.     Standard for a Motion to Reconsider

A court may alter or amend a judgment under Federal Rule of Civil Procedure 59(e) when the movant "clearly establish[es]" that "there is newly discovered evidence or there has been a manifest error of law or fact." *Harrington v. City of Chicago*, 433 F.3d 542, 546 (7th Cir. 2006). In regard to the "manifest error" prong, the Seventh Circuit has elaborated that a motion to reconsider is proper only when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). Rule 59(e) "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Because the standards for reconsideration are exacting, our court of appeals has stressed that issues appropriate for reconsideration "rarely arise and the motion to reconsider should be equally rare." *Bank of Waunakee*, 906 F.2d at 1191.

# III.    Analysis

## A.    Procedural Due Process Property Interest Claim

CUI maintains that, between April and August of 2005, the City and Dempsey deprived it of its constitutionally protected property interest in its MBE certification without due process of law, by, *inter alia*, stopping or reducing orders on existing contracts with CUI, failing to award CUI new contracts, failing to extend existing CUI contracts, and telling prime contractors that CUI was no longer certified as an MBE.   To state a Fourteenth Amendment claim for the deprivation of a property interest without due process, a plaintiff must demonstrate that (1) he had a constitutionally protected property interest, (2) he suffered a loss of that interest amounting to a deprivation, and (3) the deprivation occurred without due process of law. *Moss v. Martin*, 473 F.3d 694 (7th Cir. 2007).   In the Opinion, the Court concluded that CUI established the first element – namely, that it had a protectable property interest in its MBE certification.   However, the Court found that CUI failed to present sufficient evidence from which a reasonable jury could conclude that CUI had suffered a loss amounting to a deprivation because the evidence indicates that CUI's MBE certification retained significant value.   In particular, the record evidence shows that CUI continued to serve as an MBE subcontractor on multiple contracts without issue, that CUI retained approximately 35 target market contracts, and that the City made $939,307.61 in expenditures on those contracts during the period of alleged *de facto* decertification.   Having concluded that CUI failed to raise a genuine issue of material fact as to the deprivation element of its due process property interest claim, the Court did not consider whether CUI received all the process it was due.[2]

---

[2] Nor did the Court consider various other arguments Defendants raised in support of their motion for summary judgment as to Count III, including that: (1) CUI cannot establish municipal liability against the City under *Monell* standards; (2) CUI cannot establish liability as to Dempsey; and (3) there is no

In its reconsideration motion, CUI argues that the Court applied the wrong legal standard is assessing the deprivation prong of its due process property interest claim. In particular, the Court held that CUI was required to present evidence from which a reasonable jury could conclude that its MBE certification was rendered valueless. According to CUI, the Court set the bar too high; a party need not demonstrate that its protected property interest has been rendered *valueless* in order to establish a constitutional deprivation. Rather, CUI contends that it merely needs to demonstrate that Defendants' actions diminished the value of its MBE certification. In the alternative, CUI argues that even if the Court applied the correct standard, it erred by not construing the facts and drawing all reasonable inferences in the light most favorable to CUI.

### 1.    Proper Standard for Determining Whether a Deprivation Occurred

In considering whether Defendants could be found to have deprived CUI of its property interest in its MBE certification, the Court looked to cases discussing the effective or *de facto* revocation of a certificate or license in which the holder has a protectable property interest. The Court found that, in factually analogous cases, courts have required plaintiffs to show that the defendant destroyed the value of the property right in order to establish a deprivation. See *Reed v. Village of Shorewood*, 704 F.2d 943, 949 (7th Cir. 1983) (where defendants' actions "*destroyed the value* of the plaintiffs' licensed business and forced them ultimately to give up their Class A license, the plaintiffs were deprived of their property right in the license even though the license was never actually revoked") (emphasis added); *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1153 (10th Cir. 2001) (stating that "[a]ctions taken by the State which *destroy the value* or utility of a protected property interest constitute a Fourteenth Amendment deprivation," and holding that plaintiff stated a claim for the deprivation of a

_____

evidence that the alleged deprivations were connected to CUI's certification status. *See* Def. Open. Mem. at 8-32.

protected property interest in his peace officer certification where he alleged that, as a result of the defendants' actions, he could not use his peace officer certification to obtain employment) (emphasis added); *Westborough Mall, Inc. v. City of Cape Girardeau, Mo.*, 794 F.2d 330, 336-37 (8th Cir. 1986) (holding that city officials who prevented builders from completing a shopping mall on land that had been zoned for the mall's construction deprived the builders of their property interest in the zoning classification, even though the zoning classification never was officially revoked, because they "*destroyed the value*" of the builders' zoning right) (emphasis added). Based on that case law, the Court concluded that CUI was required to present evidence from which a reasonable jury could conclude that the Defendants' actions had rendered its MBE certification valueless.

CUI now contends that it should not be required to show that the value of its MBE certification was reduced to zero. Rather, according to CUI, the law merely requires it to demonstrate that Defendants' actions "effectively diminished the value" of the MBE certification, or that they "adversely affected" CUI's business "to an intolerable point." In support of its position, CUI relies on the Seventh Circuit's *en banc* decision in *Easter House v. Felder*, 910 F.2d 1387 (7th Cir. 1990). But, contrary to CUI's reading of the case, *Easter House* does not stand for the proposition that the State can deprive a license-holder of its property interest in a license by "effectively diminishing" the value of that license. In *Easter House*, a private adoption agency brought a § 1983 action against officials of the Illinois Department of Children and Family Services ("DCFS"), alleging that the defendants had deprived it of its property interest in the renewal of its operating license.[3] After noting that it was "not wholly

---

[3] With respect to the existence of a constitutionally protected property interest, the court concluded that the agency had a property interest in the renewal of its license by virtue of the fact that DCFS's authority to deny license renewals was limited by statute.

convinced that a deprivation of constitutional magnitude occurred," the Seventh Circuit expressly refused to resolve definitively the question of whether the agency had suffered a deprivation of its property interest. 910 F.2d at 1396. Instead, the court assumed that a deprivation had occurred (*id.*), and went on to conclude that the agency had received all of the process it was due. *Id.* at 1407. Because the *Easter House* court did not in fact find a deprivation, it does not support CUI's position.[4]

In support of its claim that it is not required to show that its MBE certification was rendered valueless, CUI also points to a number of constructive discharge and takings clause cases. The applicability of constructive discharge cases to this context is far from clear.[5] A constructive discharge generally is thought to involve "a situation in which an employer, without firing an employee, makes his working conditions so miserable that a reasonable person would be compelled to resign." *Townsend v. Vallas*, 256 F.3d 661, 677 (7th Cir. 2001). It is not clear

---

[4] The *Easter House* court stated that it would assume that a deprivation had occurred "because the appellants may have undercut the value of Easter House's 'legal license.'" 910 F.2d at 1396. CUI, perhaps understandably, takes this to mean that the Seventh Circuit would recognize a mere diminution in the value of a license or certification to be a constitutional deprivation. However, CUI's interpretation is belied by the remainder of the *Easter House* opinion. Later, the court stateD that "[t]o the extent Easter House was deprived of property, it was the result of a letter dated January 6, 1975, in which a DCFS official informed Easter House that it was out of compliance with DCFS licensing standards and would have to reattain minimum standards and 'reapply' if it wished to resume operations." 910 F.2d at 1401. It is clear from that statement that the Seventh Circuit intended to suggest only that DCFS might have effected a deprivation by refusing – albeit temporarily – to automatically renew Easter House's license. Such a denial of the agency's license renewal would not merely have diminished the value of the property interest at issue – namely, the license renewal itself – but would have destroyed it completely. Plainly *Easter House* does not support CUI's contention that the State can effect a deprivation by diminishing the value of a license.

[5] CUI justifies its reliance on constructive discharge cases on the ground that, in the Opinion, this Court looked to cases involving employment in analyzing what constitutes a deprivation. In fact, the Opinion did not discuss any constructive discharge cases. CUI may be referring to the Court's reliance on *Stidham*. But that case did not involve constructive discharge. While *Stidham* was tangentially related to the plaintiff's employment, it is instructive here because it involved the plaintiff's property interest in his peace officer certification. 265 F.3d at 1153.

to the Court – and CUI has not explained – how that standard might be applied to government contractors.

By contrast, as discussed in the Opinion, some of the basic principles informing the Supreme Court's takings jurisprudence are useful in addressing CUI's *de facto* decertification claim. Specifically, courts have long recognized that the government can effect a taking not only by transferring title to the property to the State or to another private party by eminent domain, but also by imposing regulations that "prohibit a property owner from making certain uses of her private property." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321-22 (2002) (noting the distinction between physical takings and regulatory takings). See also *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415 (1922) ("if regulation goes too far it will be recognized as a taking"); *Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection*, --- S.Ct. ---, 2010 WL 2400086, at *7 (June 17, 2010) ("[al]though the classic taking is a transfer of property to the State or to another private party by eminent domain, the Takings Clause applies to other state actions that achieve the same thing"); *Barbian v. Panagis*, 694 F.2d 476, 483 n.6 (7th Cir. 1982) ("The government need not invoke the formal power of eminent domain to confiscate property for public use. The government may deny an owner dominion over his property simply by restricting its use.") (citations omitted). Likewise, as recognized by the Seventh Circuit in *Reed* and by this Court in the Opinion, the government can deprive an individual of their property right in a license not only by formally revoking the license, but also by taking actions that destroy the value or utility of the license, thereby achieving the same result.

Thus, the Court's regulatory takings jurisprudence is helpful to the extent that it explains "that government regulation of private property may, in some instances, be so onerous that its

effect is tantamount to a direct appropriation or ouster." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). The question here is whether the City's actions were "tantamount" or "functionally equivalent" to a formal revocation of CUI's MBE certification.

The takings cases on which CUI relies provide no guidance regarding that inquiry. In order to understand why that is the case, a short discussion of regulatory takings law is necessary. In the context of regulatory takings, the Supreme Court generally has "eschewed any 'set formula' for determining how far is too far, preferring to 'engag[e] in * * * essentially ad hoc, factual inquiries.'" *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992) (citation omitted). However, the Supreme Court has identified "two categories of regulatory action that generally will be deemed *per se* takings." *Lingle*, 544 U.S. at 538. Those are: (1) regulations requiring "an owner to suffer a permanent physical invasion of her property – however minor," and (2) "regulations that completely deprive an owner of 'all economically beneficial us[e]' of her property." *Id.*; see also *Lucas*, 505 U.S. at 1019. In the two takings cases CUI cites – *Griggs v. County of Allegheny*, 369 U.S. 84 (1962) and *United States v. Causby*, 328 U.S. 256 (1946) – the Court held that the use of private airspace by government airplanes constituted a taking. The Supreme Court has since explained that those cases fell into the first category of *per se* regulatory takings because they involved a physical invasion. See *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 128 (1978) (noting that *Causby* and *Griggs* involved a physical invasion); *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 233-34 (2003) (noting that in *Causby* the government physically took possession of an interest in property – the use of private airspace – and thus was "required to pay for that share no matter how small"). Because *Causby* and *Griggs* involved physical invasions, which always constitute

a taking, whether the property owners' land retained value was not relevant. Here, there is no equivalent to a physical invasion, and thus those cases are not applicable.

As noted above, the question before the Court is whether Defendants effectively revoked CUI's MBE certification. As stated in the Opinion, one way to determine whether a *de facto* decertification occurred is to look at the impact of the City's actions on the economic value of the MBE certification to CUI. Another might be to determine whether the City essentially precluded CUI from enjoying the benefits associated with an MBE certification. With these principles in mind, the Court once again considers the impact of the City's actions on CUI's MBE certification.

### 2.     Analysis

In order to determine whether the City effectively revoked CUI's MBE certification, the Court first must consider the value or benefits associated with the certification. An MBE certification makes a vendor eligible to bid on and be awarded "Target Market" contracts, and to serve as an MBE subcontractor on all other City contracts. By extension, it also allows a vendor to reap the economic benefits of the Target Market contracts it obtains, as well as the contracts it enters into as a subcontractor with prime contractors. The pertinent inquiry is whether the City effectively denied CUI the right to enjoy those benefits.

CUI has not marshaled the evidence in a way that is particularly helpful to the Court's inquiry. CUI focuses on a number of individual incidents in an effort to demonstrate *de facto* decertification. But it is the overall effect of those incidents on CUI that matters. For example, even if it is assumed that the City refused to extend the sewer brick contract in bad faith, that incident – when viewed in isolation – says nothing about whether the City deprived CUI of its MBE certification.

As noted above, one benefit of an MBE certification is the right to bid on and obtain target market contracts. CUI has set forth evidence showing that, during the period at issue, CUI received no extensions on its contracts and was denied 6 or 7 such extensions. Pl. SOF ¶ 28.[6] The evidence also indicates that CUI was not awarded 10 contracts on which it was the lowest bidder.

Another benefit of an MBE certification is the right to serve as an MBE subcontractor on non-target market contracts. The evidence indicates that City employees told four prime contractors – Standard Truck Center, Inc., Standard Equipment Company, Midwest Service Center, Inc., and Air One Equipment – that they could no longer receive MBE credit for using CUI as a subcontractor, and that, as a result, two of those prime contractors replaced CUI with another subcontractor.

The record evidence further demonstrates that CUI continued to hold 44 contracts during the period at issue. Pl. Apx. Vol. V, Ex. F-7, Compl. ¶ 97. Thirty-five of those contracts were target market contracts, on which CUI was the prime contractor. Pl. Resp. ¶ 100. While the evidence indicates that the number of orders the City placed on those contracts fell as compared to the prior year,[7] the City continued to make significant expenditures (totaling $939,307.61) on

_____

[6] The Court makes reference to the Local Rule ("L.R.") 56.1 statements the parties submitted in connection with Defendants' motion for summary judgment [269]: Defendants' Statement of Facts ("Def. SOF") [272], Plaintiff's Response to Defendant's L.R. 56.1 Statement ("Pl. Resp.") [297], Plaintiff's Statement of Additional Facts ("Pl. SOF") [303], and Defendant's Response to Plaintiff's Statement of Additional Facts ("Def. Resp.") [311].

[7] The drop in orders appears to have been relatively significant, but precisely how significant is not entirely clear from CUI's presentation of the evidence. CUI's records show that between June and August of 2005, the City placed a total of 21 orders on the contracts, whereas it placed 180 orders on the same contracts during those moNths the previous year. Pl. SOF ¶ 86. CUI's records further demonstrate that between April and August of 2005 the City placed no orders on 26 of its contracts with CUI, whereas it had placed 99 orders total on those contracts the year before. Pl. SOF ¶ 84. However, CUI's records also show that between April and August of 2004, the City placed no orders on 14 of those 26 contracts. Def. Resp. ¶ 85. Moreover, 5 of the 26 contracts on which the City placed no orders in the summer of

its contracts with CUI during the period at issue.[8] Pl. Apx. Vol IV, Ex. C-7. CUI estimates that it suffered damages of $644,457 in all of 2005 based on Defendants' actions during the period of *de facto* decertification.[9]

Upon reconsideration, the Court once again concludes that the record evidence is insufficient to support an inference that the City effectively revoked CUI's MBE certification by destroying its value between April and August of 2005. CUI retained most of its contracts with the City and with prime contractors during that time. And the City's expenditures on CUI contracts during that five month period ($939,307.61) actually exceeded CUI's claimed damages for all of 2005 ($644,457). In sum, there is no genuine issue of material fact concerning CUI's contention that the City *de facto* decertified it between April and August of 2005.

## B. First Amendment Retaliation Claim

CUI's First Amendment retaliation claim is directed against all Defendants. The retaliation claim against the City is based on eleven actions taken by the City since the filing of this lawsuit, which were unfavorable to CUI.[10] CUI's retaliation claim against Langone is based

---

2005 expired during the disputed period. Def. Resp. ¶ 85. Finally, 41 of the 99 orders placed in 2004 were on a single contract. Def. Resp. ¶ 85.

[8] CUI attempts to downplay the significance of the volume of the City's orders between April and August of 2005 by noting that "not all of CUI's business was based on its MBE status or based on contracts from the City of Chicago." [324 at 5, n.1]. As an initial matter, the Court notes that the $939,307.61 figure reflects only orders by the City. Therefore, whether CUI also holds contracts with other entities is irrelevant. More importantly, throughout this litigation, CUI has taken the position that "[e]ach and every contract with the City on which CUI bids or is involved in is directly related to CUI's status as a certified MBE." Pl. SOF at ¶143. CUI's belated attempt to take the opposite position is not well taken. Moreover, CUI makes no attempt to demonstrate what portion of the $939,307.61 in orders, if any, is unrelated to its MBE status.

[9] In its motion CUI contends that it was on the verge of going bankrupt. However, it points to no evidence supporting that assertion, and therefore the Court will not consider it.

[10] Specifically, CUI points to the following incidents: (1) the City's refusal to extend eight contacts (which expired between 10/7/2005 and 12/31/2007); (2) the City's imposition of a communication restriction in September 2005 requiring all communication between CUI and the City to go through a

13

on his role in one of those incidents, the emergency purchase of sign blanks, while the retaliation claim against Dempsey is based on her alleged involvement in the communication restriction, as well as the award of the library shelving and library racks contracts. In the Opinion, the Court granted summary judgment in favor of Defendants on CUI's retaliation claim as against all Defendants on the ground that CUI had failed to come forward with sufficient evidence of a causal link between its protected expression and Defendants' subsequent actions. In particular, for the majority of the incidents, this Court found that CUI failed to present any evidence from which a reasonable jury could find causation. With respect to two incidents – the communication restriction and the emergency purchase of sign blanks – the Court found that CUI had presented evidence from which a reasonable jury could find that the filing of this suit was a motivating factor for those actions. However, the Court found that, with respect to those incidents, Defendants showed that they would have undertaken the alleged retaliatory acts regardless of the bad motive, and that CUI presented no evidence from which a reasonable jury could find that the City's proffered reasons were pretextual.

Before addressing the points raised by CUI in its motion to reconsider, the Court must address the proper standard for establishing causation in a First Amendment retaliation case. In the Opinion, the Court applied a line of Seventh Circuit cases stating that a plaintiff need only

---

single City official; (3) the City's issuance of short certification letters to CUI between December 2005 and November 2007 while CUI's reapplication for MBE certification was pending; (4) the City's alleged attempt to avoid awarding the recycling carts contract to CUI by bidding it as a sole source contract in January 2006; (5) the City's refusal, in the Spring of 2006, to grant CUI a price increase on the copper tubing contract; (6) the City's March 2006 emergency purchase of sign blanks; (7) the City's failure, in May 2006, to force Midwest Service Center to meet its MBE commitments to CUI; (8) the City's September 2006 determination that NAPA that it could not get MBE credit for using CUI as its subcontractor to provide hydraulic fluids, anti freeze, trans fluids, greases, and certain oil products because CUI was not a certified MBE with respect to those commodities; (9) the City's August 2006 failure to award the library shelving contract to CUI; (10) November 2006 statements by DPS's Monica Cardenas to Standard Equipment Company that the City would look favorably upon an application by Standard Equipment Company to replace CUI as its MBE subcontractor; and (11) the City's initial rejection of CUI's bid on the library racks contract in December 2006.

prove that his speech was a motivating factor in the defendant's action, as opposed to the only or the but-for cause of that action. However, in a decision issued after briefing was completed on Defendants' motions for summary judgment, the Seventh Circuit held that to establish a First Amendment retaliation claim, a plaintiff must prove that his speech was the but-for cause of the allegedly retaliatory action. *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009). See also, *Waters v. City of Chicago*, 580 F.3d 575, 584 (7th Cir. 2009) ("In a First Amendment retaliation claim, * * * the plaintiff must prove that his speech 'was the 'reason' that the employer decided to act.'") (quoting *Gross v. FBL Fin. Servs., Inc.*, --- U.S. ----, 129 S.Ct. 2343, 2350 (2009)). The Seventh Circuit's decision in *Fairley* was based on the Supreme Court's holding in *Gross*, which held that, "unless a statute (such as the Civil Rights Act of 1991) provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law." *Fairley*, 578 F.3d at 525-26. The question at the summary judgment stage is whether the record contains evidence from which a reasonable jury could find but-for causation. *Id.* at 526.

Turning to the motion to reconsider, CUI raises a number of grounds in support of its position that the Court should reverse its decision granting Defendants' motion for summary judgment as to the First Amendment claim. The Court addresses each below.

First, CUI argues that this Court disregarded holdings by the district court and the Seventh Circuit "that some of the same acts alleged in the Third Amended Complaint were inappropriate retaliation." In fact, neither court issued any such ruling. Judge Shadur modified the TRO on October 17, 2005 to enjoin the City from "using its emergency purchasing power to circumvent the award to Chicago United and pay a higher price to some other company, unless and until the City provides this Court with a showing that awarding the contract to or purchasing such goods from such other company is in accordance with the *status quo ante bellum* * * *

15

[and] imposing any restrictions on communications between Chicago United and employees of the City."  But the basis for the court's decision was not that such actions would violate CUI's First Amendment rights.  Rather, Judge Shadur simply sought to preserve what he conceived to be the *status quo*.  The content of that long since-vacated TRO has no bearing on the merits of CUI's First Amendment claim.

When the City appealed the TRO, the Seventh Circuit vacated the injunction on the grounds that the request for injunctive relief was moot in light of the City's subsequent actions (including its reinstatement all the cancelled contracts and its rescission of the debarment).[11] *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 947-49 (7th Cir. 2006).  In reaching that conclusion, the court noted that some of the conduct that CUI sought to enjoin – namely the alleged "'circumvention' tactics employed by the City, such as forcing [CUI] to communicate * * * with only a single official, who, according to CUI, ignores the communications; or entertaining CUI's bids but then awarding the contracts to bidders who submit much higher bids" – was "not charged in the complaint * * * and postdate[d] the event on which the complaint is based, namely the issuance of the termination and disbarment orders." *Id.* at 947-48.  Therefore, the threat of such conduct did not save the request for injunctive relief from mootness.  The court went on to opine, in *dicta*, that "[a]ssuming that the charges [regarding the 'circumvention' tactics] are accurate, they are best described as retaliation against CUI for fighting the termination and disbarment." *Id.* at 948.  The court further noted that CUI could "bring a suit * * * to enjoin the alleged retaliation," but refused to speculate as to the legal

---

[11] As the Seventh Circuit determined on appeal, the TRO had been kept in force by the district court for more than 20 days without the City's consent; therefore, the TRO was deemed a preliminary injunction and was appealable. *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 943 (7th Cir. 2006).

theory on which CUI might base such a suit.  *Id.*  The Seventh Circuit said nothing about the merits of any such claim.

CUI's also contends (1) that the Court failed to look at the totality of the evidence, which it contends illustrates a pattern of retaliation by the City that is sufficient to raise a genuine issue of material fact regarding the City's motive; and (2) that the Court misconstrued the facts with respect to three of the allegedly retaliatory incidents – the communication restriction, the recycling carts contract, and the emergency purchase of sign blanks.  Because the first argument relates only to CUI's claim against the City, the Court addresses these remaining arguments (to the extent they are applicable) in the context of CUI's claims against each of the Defendants.

### 1.    CUI's Retaliation Claim Against the City

CUI argues that the totality of the evidence, which it contends the Court overlooked in the Opinion, illustrates a pattern of adverse actions by the City that is sufficient to create a genuine issue of material fact as to the City's motive.[12]  In the Opinion, this Court recognized that, under certain circumstances, evidence of a pattern of adverse actions combined with suspicious timing might be sufficient to establish the requisite causal link to establish a *prima facie* case of retaliation.  See *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (in first amendment retaliation case a plaintiff may establish causation by proving "a pattern of antagonism coupled with timing"); *Hunt-Golliday v. Metropolitan Water Reclamation*

---

[12] In its reply brief, CUI raises two additional incidents that have occurred since the grant of summary judgment, which it claims further demonstrates a pattern of retaliation by the City.  In particular, in March 2010, the City awarded CUI a contract for pavement marking equipment; sometime after the contract was awarded, Langone informed CUI that the City would not be ordering any of the commodity.  Second, shortly after the grant of summary judgment, the Department of Compliance, which administers the MBE certification program, conducted an on-site visit to CUI.  According to CUI, that visit put CUI's MBE certification under "unusual scrutiny."  In their surreply, Defendants contend that the Court should refuse to consider these new matters at this late stage.  The Court has considered the new evidence with respect to CUI's pattern of retaliation argument, but it does not change the Court's conclusion that CUI's argument fails to carry the day.

*District of Greater Chicago*, 104 F.3d 1004, 1014 (7th Cir. 1997) (stating in the context of a Title VII retaliation claim that a pattern of criticism and animosity by supervisors following protected activities supports the existence of a causal link); *Collins v. Village of Woodridge*, 96 F. Supp. 2d 744, 753 (N.D. Ill. 2000) (stating in the context of a Title VII retaliation claim that "a pattern of criticism by supervisors following the making of a complaint can establish the existence of a causal link").  However, the Court concluded that, viewing the record as a whole in the light most favorable to CUI, there was insufficient evidence from which a reasonable jury could find causation.  In particular, the Court found that no reasonable jury could conclude that the City had been waging a campaign of retaliation against CUI in light of the undisputed evidence that, in the three years after CUI filed this suit, the City had extended 14 contracts with CUI, awarded CUI 93 new contracts, and had placed orders totaling more than $24.2 million on those contracts.

Nothing in CUI's motion persuades the Court to reconsider that conclusion.  CUI largely rehashes the argument that it made (and that the Court rejected) on summary judgment, which is not appropriate on a motion for reconsideration.  See *Caisse Nationale de Credit v. CBI Industries*, 90 F.3d 1264, 1270 n.1 (7th Cir. 1996). While CUI points to new evidence of two additional incidents – Langone's statement that the City would not be placing any orders on CUI's pavement marking equipment contract and the Department of Compliance's on-site visit – CUI fails to tie either of those incidents to its protected speech.  The mere fact that the incidents occurred while CUI and the City were engaged in protracted litigation is not sufficient to support an inference of causation.[13]

---

[13] Moreover, it is not even clear whether the site visit even can be characterized as an adverse action or an indication of the City's animosity towards CUI.  Surely the City department responsible for administering the MBE certification program is entitled to monitor MBE certified vendors by making on-site visits.

Moreover, even if the Court were to conclude that the totality of the evidence is sufficient to raise a genuine issue of material fact regarding the City's motive, the City nevertheless would be entitled to summary judgment on Count IV because CUI has failed to establish municipal liability for the alleged First Amendment violation. A municipality is not liable under § 1983 unless the constitutional violations at issue are caused by a municipal policy or custom. See *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978). The "official policy" requirement for § 1983 liability is designed to "distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). "Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)). Municipalities can be found liable under § 1983 for violating a plaintiff's civil rights through "(1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009).

Defendants argue that CUI cannot show that the City has a policy of First Amendment retaliation because the City's official policy – as set forth in a consent decree the City entered into in *Alliance to End Repression v. City of Chicago*, 561 F. Supp. 537, 559-74 (N.D. Ill. 1982) – prohibits it from "disrupt[ing], interfere[ing] with or harass[ing] any *person* because of the person's *First Amendment conduct*." See *Limes-Miller v. City of Chicago*, 773 F. Supp. 1130,

---

CUI presents no evidence that it was the only MBE certification holder to receive such a visit, or that it otherwise has been treated differently by the Department of Compliance.

1137 (N.D. Ill. 1991) (emphasis in original). Courts have held that the consent decree sets City policy on First Amendment retaliation. See *id.*; *Auriemma v. City of Chicago*, 747 F. Supp. 465, 475 (N.D. Ill. 1990). While the consent decree demonstrates that the City does not have an express policy of retaliation, it does not necessarily shield the City from all First Amendment retaliation claims. See *Marcavage v. City of Chicago*, 467 F. Supp. 2d 823 (N.D. Ill. 2006) ("Simply having [the consent decree] on the books cannot shield Chicago from the possibility that it has adopted other official policies that in fact violate an individual's First Amendment rights and would thus be actionable under *Monell*").

CUI argues that the City's Chief Procurement Officer ("CPO") has final policymaking authority, such that the City is liable for any conduct that Dempsey or Barbara Lumpkin[14] undertook or ratified as CPO under the third *Monell* scenario. Whether a particular official has final policymaking authority is a question of state law. See *Duda v. Board of Ed. of Franklin Park Public Sch. Dist. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998). Seventh Circuit precedent teaches that policymakers are those who possess "authority to adopt rules for the conduct of government." *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988)); see also *Rasche v. Village of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) ("[i]n order to have final policymaking authority, an official must possess '[r]esponsibility for making law or setting policy'"). Both the Supreme Court and the Seventh Circuit have explained that the pertinent "inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker 'in a particular area, or on a particular issue.'" *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009); see also *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997) ("Our cases on the

---

[14] Dempsey left the Department of Procurement Services ("DPS") in early September 2005 to take the position of commissioner of the Chicago Public Library. Lumpkin served as CPO after Dempsey's departure, from September 16, 2005 to October 15, 2007. Def. SOF ¶ 21.

liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue"); *Praprotnik*, 485 U.S. at 123 ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy *in that area of the city's business*") (emphasis in original).

Here, the relevant question is whether the CPO is a final policymaker as to First Amendment policy. Under Illinois law, the city council possesses the requisite authority to adopt rules for the conduct of government, and thus is considered the policymaking authority for the City. See *Rasche*, 336 F.3d at 601 (generally "the policymaking authority in the city structure will be the city council"). Consequently, the Chicago City Council has final policymaking authority for the City. While the Chicago City Council conceivably could delegate authority to set First Amendment policy to the CPO (*Kujawski v. Board of Com'rs of Bartholomew County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999) ("Final policymaking authority may be * * * delegated * * * by an official having policymaking authority"), CUI presents no evidence that the City Council has delegated final policymaking authority to the CPO on that issue. Nor has the Court otherwise found any reason to conclude that the City Council delegated policymaking authority with respect to First Amendment policy to the CPO. Thus, the CPOs' acts were not the acts of municipal policymakers. That conclusion is confirmed by the fact that the City has an express policy – embodied in the consent decree – prohibiting retaliation for First Amendment activities. See *Waters*, 580 F.3d at 582 ("[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies * * * are the act of the municipality") (quoting *Praprotnik*, 485 U.S. at 127); *Auriemma*, 957 F.2d at 400 ("Liability for unauthorized

acts is personal; to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy.").

CUI also argues that the alleged retaliatory actions were "acquiesced" in by final policymakers. CUI's use of the term "acquiesce" suggests that it also seeks to establish municipal liability under the second *Monell* prong, *i.e.*, that there was a widespread practice of treating CUI as decertified that constituted a custom or practice. See *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993) ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their *acquiescence* in the established practice.") (emphasis added). Because CUI bears the burden of proving the alleged widespread practice at trial, it must set forth specific facts showing that there is a genuine issue of material fact regarding the existence of a widespread policy or practice. *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). Aside from its use of the word "acquiesce," there is no indication that CUI even intends to argue that there was a widespread practice of retaliating against it. In discussing the retaliation claim, CUI uses the term "widespread" only once, and even then only to describe the communication restriction. In any event, the evidence set forth by CUI is insufficient to give rise to a genuine issue of material fact as to whether the City had a widespread policy or practice of First Amendment retaliation.

In the prototypical case, a widespread practice is established by showing that the municipality applied an unconstitutional policy to many different individuals. *Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006). Here, there is no evidence that the City retaliated against any other City contractors for filing suit against it. But the fact that CUI does not point to actions directed at other contractors to establish the existence of a widespread practice does not defeat its claim. In *Phelan*, the Seventh Circuit considered "whether a reasonable jury could

infer the existence of a policy through repeated actions directed at one person," and concluded that "a plaintiff should [not] be foreclosed from pursuing Section 1983 claims where she can demonstrate that repeated actions directed at her truly evince the existence of a policy." *Id.* at 789-90. However, CUI nevertheless fails to carry its burden. In order to establish a widespread practice, a plaintiff must show "a series of bad acts" from which the court can infer "that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate[s]." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995). As discussed above, the relevant policymaker is the City Council, not Dempsey and Lumpkin as CUI contends. There is no evidence indicating that the City Council was aware of any of the alleged acts of retaliation. In sum, CUI has failed to establish a basis for municipal liability for the alleged retaliation under *Monell*. That alone entitles the City to summary judgment on CUI's First Amendment claim. Therefore, CUI's motion to reconsider is denied as to the retaliation claims asserted against the City.

## 2. CUI's Claim Against Dempsey

The communication restriction – in addition to the award of the library shelving and library racks contracts – forms the basis for CUI's retaliation claim against Dempsey. In the Opinion, the Court concluded that CUI had presented sufficient evidence of a causal link between CUI's speech and the communication restriction, such that the burden shifted to Defendants to show that the same decision would have been made in the absence of the protected speech. The Court then found that Defendants had carried that burden by presenting evidence that the restriction was motivated by a desire to prevent CUI's persistent inquiries from distracting DPS employees from their other work, as well as to ensure that CUI received

consistent information. In particular, the City presented Lori Lightfoot's testimony to that effect (Pl. Apx. Vol. II, Ex. B-12 at 250), as well as Claude Humphrey's testimony that Aileen Velasquez told him that all communication was being funneled through her because having multiple points of contact was disruptive and was resulting in CUI getting conflicting information (Pl. Apx. Vol. II, Ex. B-16 at 63). The Court concluded that CUI had failed to present evidence demonstrating that those legitimate proffered reasons were pretextual.[15]

CUI argues that the Court overlooked evidence that raises a genuine issue of material fact as to whether one of Defendants' proffered reasons for the communication restriction – avoiding the disruption of DPS employees – is pretextual. CUI points to Humphrey's testimony that CUI's inquiries were not disruptive to him.[16] But even if that testimony undermined the Defendants' claim that they were motivated by a desire to eliminate disruptions, Defendants' other proffered reason – the desire to ensure that CUI was not given conflicting information – remains, and CUI has not introduced any evidence even suggesting that that reason is pretextual. Consequently, the Court finds no basis to reconsider its grant of summary judgment in Dempsey's favor on the First Amendment claim.

### 3. CUI's Claim Against Langone

CUI's retaliation claim against Langone is premised on his role in the March 2006 emergency purchase of $742,216 worth of sign blanks. Def. SOF at ¶ 185. As a matter of state law, the City's emergency contracts are not publicly bid or advertised. Rather, the User

---

[15] With respect to the library shelving and library racks contracts, the Court concluded that CUI failed to demonstrate any link between its protected speech and either of those incidents. CUI does not ask the Court to reconsider that finding.

[16] CUI also claims that Lorel Blameuser testified that CUI's inquiries were not disruptive, but the evidence CUI cites does not support that contention. See Pl. SOF ¶ 93.

Department – here, the Department of Transportation – solicits quotes from the vendors of its choice.  The DOT opted not to solicit a quote from CUI.

For purposes of the Opinion, the Court assumed that the decision not to solicit bids from CUI was made by Langone, and concluded that Langone's involvement (in addition to evidence that the City had improperly divided up the purchase in order to avoid the $250,000 cap on emergency purchases) gave rise to a reasonable inference of retaliatory motive.[17]  However, the Court found that CUI failed to present evidence demonstrating that Defendants' proffered reason for the decision – CUI's history of making late deliveries on the aluminum sign blanks contract – was pretextual.

CUI "bears the burden of persuasion to show that the defendants' proffered reason [was] pretextual and that [its protected speech] was the real reason that" Defendants did not solicit bids from CUI.  *Vukadinovich v. Board of School Trustees of North Newton School Corp*., 278 F.3d 693, 699 (7th Cir. 2002).   "In the summary judgment context, this means that, to rebut the defendants' proffered explanations for their [actions], [CUI] must produce evidence upon which a rational finder of fact could infer that these explanations were lies." *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006).   Pretext may be shown with evidence that the defendants' justifications are factually baseless, are not the actual motivation for the adverse action, or are insufficient to motivate the adverse action.  See *Ajayi v. Aramark Bus. Services, Inc*., 336 F.3d 520, 534 (7th Cir. 2003); *Vukadinovich*, 278 F.3d at 699-700.  In its reconsideration motion, CUI contends that a reasonable jury could infer that Langone's proffered reason for not soliciting a

---

[17] Contrary to CUI's assertion, the Court did not accept Langone's testimony that he made the decision jointly with Gilberto Quinones and Cheri Heramb.  The Court did, however, accept his testimony that the decision was motivated by CUI's history of making late deliveries on the aluminum sign blanks contract, noting that that history of late deliveries was corroborated by a August 17, 2005 letter from Heramb to Dempsey stating that CUI had taken anywhere from 248 days to 399 days to deliver some of the ordered sign blanks, while the contract required them to deliver within 14 hours of receiving a City order.

quote from CUI was a lie based on the fact that CUI was awarded the aluminum sign blanks contract when the City put it out for public bid in December 2006.[18]

The record evidence shows that the decision to make a purchase on an emergency basis must be approved by the Department of Procurement Services. See Langone Dep., Pl. Apx. Vol. II, Ex. B-11 at 96 ("Procurement * * * would give authorization to proceed with the process of an emergency request. You would get their approval first"); Quinones Dep., Pl. Apx. Vol. III, Ex. B-26, at 49-50 (emergency purchase must be approved by DPS); Chicago Municipal Code § 2-92-644 (stating that emergency contracts are awarded by the chief procurement officer); Pl. SOF at ¶ 141 (stating that Lumpkin, as CPO, had the ultimate authority to approve emergency purchases). There is no evidence that Langone played any role in determining whether an emergency existed, or whether the signs should be purchased on an emergency basis. See Pl. SOF at ¶ 141; Langone Dep., Pl. Apx. Vol. II, Ex. B-11 at 102. Nor has CUI presented any

---

[18] The Court granted CUI leave to file 144 statements of additional fact. Nevertheless, the Court can find no reference to the fact that CUI was awarded the aluminum sign blanks contract in December 2006 in CUI's statement of additional facts. It appears that CUI makes reference to the December 2006 award of the aluminum sign blanks contract only in its responses to Defendants' 56.1 statement. See Pl. Resp. at ¶¶ 185, 187. It is for that reason that the Court overlooked this factual assertion in the Opinion. CUI's approach is inconsistent with the local rules, which require a party opposing summary judgment to set forth "any additional facts that require the denial of summary judgment" in a separate statement of additional facts, consisting of short numbered paragraphs. L.R. 56.1(b)(3)(C). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, e.g., Koszola v. Bd. of Educ. of the City of Chicago, 385 F.3d 1104, 1109 (7th Cir. 2004); Curran v. Kwon, 153 F.3d 481, 486 (7th Cir. 1998) (citing Midwest Imports, Ltd. v. Coval, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Therefore, the Court would be within its discretion to disregard the fact that CUI was awarded the aluminum signs contract in December 2006. See Ciomber v. Cooperative Plus, Inc., 527 F.3d 635, 643 (7th Cir. 2008) (district court did not err in refusing to consider facts proposed in plaintiff's Rule 56.1 response where plaintiff's response contained long, argumentative paragraphs, which included both denials of defendant's proposed material facts and presented additional facts of his own, as plaintiff had failed to comply with L.R. 56.1(b)(3)(B) and (b)(3)(C)).

evidence that no emergency existed to justify the March 2006 emergency purchase of sign blanks.[19]

In light of the uncontroverted evidence showing the City's emergency need for sign blanks and CUI's history of delivering aluminum sign blanks as much 248 days to 399 days late, the decision not to involve CUI in the March 2006 emergency purchase does not appear to be unreasonable or pretextual. The fact that the City decided to award CUI the aluminum sign blanks contract nine months later, under non-emergency circumstances, does not give rise to an inference that the decision not to solicit a quote from CUI during the March 2006 emergency was motivated by Langone's desire to retaliate against CUI for the filing of this lawsuit. Therefore, the Court declines to reconsider its grant of summary judgment in Defendant Langone's favor on Count IV.

### C.    Breach of Contract Claim

Finally, CUI urges the Court to reconsider its ruling in favor of Defendants on CUI's breach of contract claim, in which CUI alleged that, between April and August of 2005, the City breached essentially all of its existing contracts with CUI by (1) reducing the number of orders it placed on certain contracts, (2) failing to extend certain contracts, and (3) failing to maintain open communication with CUI. In the Opinion, the Court concluded that CUI had not set forth evidence raising a genuine issue of material fact as to whether the City had committed a breach. CUI asks the Court to reconsider each of the three bases for its breach of contract claim.

---

[19] CUI asserts that there was no emergency justifying the emergency purchase of sign blanks, but does not cite evidence supporting that assertion. See Pl. Resp. ¶ 185. The record evidence indicates that emergency purchases are permitted where the City has no contract for the commodity at issue, and the City needs the commodity in order to ensure public safety. See Langone Dep., Pl. Apx. Vol. II, Ex. B-11 at 102-103. There is no suggestion in the summary judgment record that the City had an existing contract for signs (indeed CUI's contract had expired) or that it did not need the sign blanks.

## 1.     Stopping or Reducing Orders on Existing Contracts

To prevail on a breach of contract claim under Illinois law, a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) its performance under the terms of the contract; (3) that the defendant breached the contract; and (4) that the plaintiff suffered an injury as a result of the defendant's breach. *Burrell v. City of Mattoon*, 378 F.3d 642, 651 (7th Cir. 2004); *Oliva v. Amtech Reliable Elevator Co.*, 851 N.E.2d 256 (Ill. App. Ct. 1st Dist. 2006).  All of the contracts at issue are requirements contracts.  Under Illinois law, "a buyer [in a requirements contract] may not terminate its requirements in bad faith."  *Schawk, Inc. v. Donruss Trading Cards, Inc.*, 746 N.E.2d 18, 23 (Ill. App. Ct. 1st Dist. 2001).  Nor may a buyer demand a "quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."  810 ILCS 5/2-306.  Therefore, CUI may establish the third element of a breach of contract claim – that the City breached its contracts – by demonstrating that the City stopped placing orders, or unreasonably reduced the volume of its orders, in bad faith.

In the Opinion, the Court concluded that CUI failed to present evidence raising a genuine issue of material fact regarding whether the City had reduced or terminated its requirements in bad faith.  CUI now contends that the Court disregarded the fact that the City stopped orders on 26 contracts during the disputed period, and that that evidence is sufficient to raise a genuine issue of material fact regarding whether the City acted in bad faith.  In CUI's view, the City *must* have needed janitorial supplies, police protection equipment, aluminum street signs, firehouse accessories, and the other commodities for which it held contracts with CUI between March and August of 2005, such that the City's failure to place any orders for those commodities *must* have been in bad faith.  But, as noted in the Opinion, the mere fact that

28

the City did not place any orders on those contracts during a five month span in 2005 is not evidence of bad faith. See *Zeidler v. A & W Restaurants, Inc.*, 301 F.3d 572, 575 (7th Cir. 2002) (plaintiffs' "unsupported assertions" that defendants acted in bad faith in canceling contract "are not evidence sufficient to defeat a motion for summary judgment"). As Seventh Circuit precedent makes clear, CUI's "bare speculation" that the City needed the commodities at issue will not suffice to defeat summary judgment. *Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 424 F.3d 659, 669 (7th Cir. 2005). As the Seventh Circuit recently stated, "[a]t summary judgment, * * * saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact." *U.S. v. 5443 Suffield Terrace, Skokie, Illinois*, 2010 WL 2292185, at *5 (7th Cir. June 9, 2010); see also *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) ("[t]o survive summary judgment, a non-moving party must 'show through specific evidence that a triable issue of fact remains on issues for which the nonmovant bears the burden of proof at trial'") (citation omitted).

Here, with respect to the City's reduced orders, CUI has presented no evidence indicating that the quantities the City did order were "unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements." 810 ILCS 5/2-306. For example, CUI sets forth no evidence as to the frequency with which the City normally placed orders on the contracts at issue, or the volume of those orders. The only evidence CUI has presented demonstrates that the City placed more total orders on the contracts at issue in 2004 than it did in 2005.[20] That evidence, however, is not sufficient

---

[20] In support of its motion for reconsideration, CUI states that the City "needed and placed orders for these goods during the same time period[] in * * * 2006." However, CUI cites no evidence supporting that contention.

to raise a genuine issue of material fact regarding whether the City acted in bad faith. First, as noted in the Opinion, CUI does not indicate the number of orders the City placed on each individual contract in 2004 as compared to 2005. Therefore, there is no way for the Court to determine which, if any, of the individual contracts may have been breached. Moreover, the fact that the City placed orders on the contracts during the summer of 2004 says nothing about its need for the commodities during the summer of 2005.

Furthermore, with respect to all of the contracts, CUI has set forth no evidence indicating that the City needed to order additional supplies of the commodities at issue during that five month period. CUI's assumption that the City needed additional supplies of the commodities is not sufficient to survive a motion for summary judgment. In sum, CUI has not carried its burden of setting forth specific facts demonstrating a genuine issue of material fact for trial, and nothing in the motion for reconsideration changes that.

### 2. Refusing to Extend Contracts

CUI also contends that the City breached contracts by failing to take advantage of available extensions. The contracts at issue do not, by their terms, obligate the City to grant CUI contract extensions. According to CUI, the Court overlooked testimony demonstrating that the City regularly exercised extension options during its 20 year relationship with CUI. That is not so. Rather, in the Opinion, the Court found that Illinois law precluded it from implying a term *requiring* the City to extend contracts based on that course of dealing because such a term would contradict the express terms of the contracts.[21] See *Midwest Builder Distributing, Inc. v. Lord*

---

[21] With the exception of three contracts, all of the contracts at issue contain contract extension clauses allowing the City, at its *discretion*, to extend. A term *requiring* the City to extend contracts would contradict the express terms of those contract extension clauses. Of the three contracts that did not contain such a contract extension clause, two expired outside the relevant time period, and therefore, by CUI's own admission, are not at issue in this lawsuit. The remaining contract, for laser speed detectors, contained no extension clause. However, even if the Court were to imply a term requiring the City to

*and Essex, Inc.*, 383 Ill. App. 3d 645, 673 (1st Dist. 2007) ("if the express terms of the contract and the course of performance cannot be reconciled, express terms will trump course of performance"); *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Products, Inc.*, 212 F.3d 373, 380 (7th Cir. 2000) ("the Illinois Commercial Code only allows extrinsic evidence including course of performance, course of dealing, and usage of trade to be considered when it is reasonably consistent with the express terms of the contract").  In its motion for reconsideration, CUI argues that there is sufficient evidence from which a reasonable jury could find that the City refused to extend the contracts in bad faith.  But whether the City acted in bad faith has nothing to do with whether the parties' course of performance can be used to supplement the terms of the contracts.  Here, for the reasons stated in the Opinion, it cannot.  And the City cannot be found to have breached the contracts for failing to do that which it was not contractually obligated to do, regardless of its motivation.

### 3. Failure to Communicate with CUI

In the Opinion, the Court concluded that CUI could not state a breach of contract claim based on the City's failure to communicate with CUI because CUI set forth no evidence indicating that the parties were contractually obligated to maintain any particular level of communication with each other.   Put differently, CUI failed to raise a genuine issue of material fact as to whether the contracts created an enforceable contractual right to a particular level of communication.   In its motion for reconsideration, CUI simply advances arguments already

---

extend that contract where the City still needs the goods and CUI is able to supply those goods at the stated contract price, CUI has failed to raise a genuine issue of material fact as to whether the City breached that contract because because CUI has presented no evidence that the City still needed laser speed detectors when the contract lapsed, or that CUI could supply them at the stated contract price.

rejected by the Court on summary judgment.  But "[r]econsideration is not an appropriate forum for rehashing previously rejected arguments."  *Caisse Nationale,* 90 F.3d at 1270.

## IV.  Conclusion

For the foregoing reasons, CUI's motion to reconsider [323] is denied and CUI's motion for leave to supplement its Joint Appendix [326] is denied.

Dated:  September 10, 2010          _____
                                    Robert M. Dow, Jr.
                                    United States District Judge